**FARMLAND FOODS, INC., Appellee,**

v.

**DUBUQUE HUMAN RIGHTS COMMISSION,**
Appellant,

and

**Samuel O. Taylor, Intervenor–Appellant.**

No. 02–0063.

Supreme Court of Iowa.

Dec. 17, 2003.

William G. Blum, Dubuque, for appellant.

Dorothy A. O'Brien of O'Brien & Greve, P.L.C., Davenport, for intervenor-appellant.

Michael R. Lied of Howard & Howard Attorneys, P.C., Peoria, Illinois, and Brendan T. Quann of O'Connor & Thomas, P.C., Dubuque, for appellee.

CADY, Justice.

This employment case centers on a variety of complaints of discrimination by an employee of a meatpacking plant over the course of his employment. A local human rights commission awarded damages. The district court reversed the decision of the human rights commission on judicial review and dismissed the complaint. On appeal, the court of appeals reversed the decision of the district court. On further review, we vacate the decision of the court of appeals and affirm the judgment of the district court.

## I. Background Facts and Proceedings.

Samuel Taylor (Taylor) began working as a meat processor in a meatpacking

plant located in Dubuque in 1983. He was twenty-five years old when he began his employment. The plant was owned by FDL Foods, Inc. In 1996, Farmland Foods, Inc. (Farmland) purchased the plant. Taylor continued to work at the plant after the purchase with no interruption in service. The plant slaughtered hogs and processed pork. The working conditions were noisy and cold, and many jobs were gruesome and bloody. The work was fast-paced, repetitious, generally stressful, and sometimes unstimulating. The continuous flow of the product along production lines required a coordinated, fast-paced effort by workers. Worker absenteeism was a frequent problem at the plant, especially in the "hog kill" department. This meant employees were often moved to other jobs to cover understaffed areas.

A union represented the employees. Many employment decisions affecting workers were governed by a collective-bargaining agreement, while other decisions were within the discretion of management and supervisors. Generally, the plant recognized seniority in making job assignments, and qualified employees with seniority could request to move to open positions.

Over the course of his employment, Taylor, who is black, became dissatisfied with shift and work assignments. He also experienced various confrontations and problems with supervisors, most notably Dick Sherman (Sherman). Sherman is white. The problems between Sherman and Taylor form the core facts of the litigation.

Each employee at the plant was assigned to a department, referred to as their "home base," and to a specific shift at the time employment began. Taylor was assigned to the "smoked meats" department, second shift. He was the only black man assigned to this department. Sherman was a supervisor in the smoked meats department.

One problem Taylor experienced during his employment at the plant was his inability to move from second shift to first shift. As early as 1984, Taylor was denied various requests to change shifts while other workers in the smoked meats department were able to move. Another complaint was based on Sherman's denial of Taylor's request to leave work early after he had completed his regularly assigned work, as other employees were able to do on occasion. As a result, Taylor was required to complete his shift. These incidents primarily occurred before or during 1989 or 1990. Another complaint occurred in 1990 when Taylor was temporarily assigned to a boxing job in the "ham wrap" department during the vacation of another employee and was told by his supervisor he needed to work faster. Although Sherman was not Taylor's supervisor that day, he intervened and threatened to write a disciplinary memo concerning the incident. No memo, however, appeared in Taylor's work records. Taylor filed a grievance over the incident, which was denied.

During the term of his employment, Taylor filed numerous grievances involving Sherman's actions. Taylor did not have significant problems with other supervisors during his employment. One of the grievances related to Sherman's conduct resulted in a minor change to departmental procedure. The rest were denied.

Taylor felt Sherman frequently singled him out for discipline and was overly critical of his work. One example involved a problem Taylor and other production-line employees encountered in placing nets around hams during a period of several months. Although the problem ultimately was attributed to the incorrect size of the nets, Sherman frequently criticized the workers on the line in a loud voice, and

was particularly critical of Taylor for failing to meet production standards. Taylor, however, was never formally disciplined.

Taylor also complained that Sherman generally watched over him more than he watched the other employees and treated him differently than white employees. On one occasion, Taylor and three other employees were working when the machine they were using broke down. As the employees were waiting for it to be repaired, Sherman assigned Taylor and another employee to perform other jobs, but did not assign the other two employees to another job. At times Sherman criticized Taylor for using the restroom outside regular break time. Taylor also felt Sherman singled him out for returning to the production line late from breaks. One white employee occasionally returned a minute or so late from break with no comment from Sherman. None of the incidents resulted in any form of discipline.

After Farmland purchased the Dubuque plant in 1996, the smoked meats department was substantially reduced in size due to reduced production. Consequently, most of the smoked meats employees, including Taylor, were laid off and reassigned to other departments. When a worker was laid off because of the lack of work in the assigned department, the company reassigned the worker to a different department, and the worker was then considered to be a temporary worker in that department until such time as they could return to their home base. Taylor was reassigned to the hog kill department. Most of the jobs in the hog kill department were physically demanding, messy, and unpleasant. Sherman did not work in the hog kill department.

After Taylor was assigned to the hog kill department, he complained about his job assignments and requested a different job on several occasions. His supervisor de-

nied the requests. He was also formally disciplined for leaving his job without permission on one occasion to go to the superintendent to complain about the manner he was being treated by supervisors. The disciplinary document was later removed from the file, and Taylor was later given the job he wanted.

Taylor was recalled to the smoked meats department in the fall of 1997 and was again under Sherman's supervision. He felt Sherman badgered him about working too slowly after he returned. Taylor was unfamiliar with the job he was assigned, and Sherman wanted him to work faster. Sherman talked to Taylor more than once a week about the need to work faster. Taylor was subsequently laid off, and reassigned to the hog kill department in December 1997. He was eventually given the vacuuming job he requested in the hog kill department, and worked at this job until early April 1998.

In the spring of 1998, Taylor began to hear that Farmland had called other employees back to the smoked meats department. He felt he should also be transferred back to the smoked meats department and was chided by coworkers for not being called back.

On April 6, 1998, his supervisor assigned another employee to do Taylor's vacuuming job after the employee reported to work with a light-duty restriction imposed by a doctor. The employee was given Taylor's vacuuming job, and Taylor was assigned to the "pans" job. Taylor was unhappy about the move. When he reported to work the next day, April 7, his supervisor again assigned him to do the pans job. Taylor objected and demanded to meet with another supervisor, who was not immediately available to talk to Taylor. He then cleaned out his locker and quit.

Taylor believed many of the problems he experienced during his fifteen-year employment were racially motivated. He also believed the actions of Sherman were discriminatorily motivated. However, Sherman never used any racially derogatory language toward Taylor, and no employee ever heard Sherman use such language in talking to other employees. At unspecified times during his employment, Taylor observed racial graffiti on the bathroom walls and was called racially derogatory names by two employees.

Shortly after Farmland purchased the plant, the new plant manager conducted an investigation into Taylor's complaints of discrimination at Taylor's request. The manager concluded that no racial discrimination had taken place in the plant. Instead, the manager concluded that Sherman and Taylor had a personality conflict. Sherman was a demanding supervisor, and Taylor was not the type of person to back down from a confrontation. Two other employees felt Sherman picked on Taylor at times because of his race, but were unable to identify a reason to support their belief other than Taylor generally seemed to be the target of Sherman's supervisory conduct.

On April 28, 1998, Taylor filed a complaint of discrimination against Farmland with the Dubuque Human Rights Commission. On January 11, 1999, an administrative law judge issued a finding of probable cause. Taylor then amended his complaint to allege racial discrimination, racially hostile work environment, constructive discharge, and unlawful retaliation.

Following a hearing, an administrative law judge issued recommended findings of fact and conclusions of law. The judge believed the evidence did not support the claims and recommended the complaint be dismissed. On April 9, 2001, the human rights commission adopted the findings of fact of the administrative judge, but determined Taylor established each claim. It awarded Taylor $22,292 in lost wages and $50,000 in emotional distress damages, in addition to attorney fees and costs.

On judicial review, the district court reversed the decision of the human rights commission and dismissed the complaint. The district court found no substantial evidence to support any of the four claims.

Taylor filed an appeal, and we transferred the case to the court of appeals. On appeal Taylor claimed the record contained substantial evidence of racial discrimination and a racially hostile work environment. Taylor did not appeal from the adverse rulings by the district court on his claims of constructive discharge and unlawful retaliation.

The court of appeals reversed the district court. It found substantial evidence that Taylor suffered an adverse employment action to support the claim of racial discrimination. It did not address the hostile-work-environment claim. It also did not consider numerous defenses raised by Farmland. We granted further review.

## II. Scope of Review.

█ Our review is for errors at law. Iowa Code § 17A.19(8) (1997). The findings of the agency are binding if supported by substantial evidence. *IBP, Inc. v. Al–Gharib*, 604 N.W.2d 621, 632 (Iowa 2000).

## III. Timeliness of Complaint.

We first address the issue of the timeliness of the complaint. Farmland consistently raised this issue at every relevant stage of the case.

The Dubuque human rights ordinance governing this case requires a complaint to be filed "within one hundred and eighty (180) days after the alleged discriminatory or unfair practice occurred." Dubuque

City Code § 27–113. This time period is consistent with Iowa Code section 216.15(12). Taylor filed his complaint on April 28, 1998. Clearly, most of the evidence presented in the case concerned events that predated the relevant 180–day time period. Thus, we must consider if Taylor's claims were timely filed. For the purposes of this appeal, the only claims for consideration are racial discrimination and hostile work environment.

■ We have previously recognized and applied the "continuing violation" doctrine to resolve statute of limitations claims in discrimination actions. *Hy–Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n,* 453 N.W.2d 512, 527 (Iowa 1990). Generally, if a violation is continuing, the period of limitation does not begin to run on a claim at the time the unlawful act first occurs, but the claim is considered to be filed within the period of limitation if some unlawful acts occurred within the limitations period. *Id.* However, this doctrine applies differently to claims of discrete discriminatory acts than to claims of hostile work environment. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110–21, 122 S.Ct. 2061, 2070–76, 153 L.Ed.2d 106, 120–27 (2002).

■ Each discrete discriminatory act or event is separately actionable, and a claim based on discrimination must be filed within the relevant limitation period after the act occurred. *Id.* at 114, 122 S.Ct. at 2073, 153 L.Ed.2d at 122. This is true even when the discrete discriminatory act relates to other acts alleged in a timely filed complaint. *Id.* at 113, 122 S.Ct. at 2072, 153 L.Ed.2d at 122. However,

> [t]he existence of past acts and the employee's prior knowledge of their occurrence ... does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Id.*

■ On the other hand, claims of hostile work environment are fundamentally different. Unlike discrete acts of discrimination, they involve repeated conduct and are based on the cumulative impact of separate acts. *Id.* at 115, 122 S.Ct. at 2073, 153 L.Ed.2d at 123. Under such a claim, it makes no difference that some of the component acts fall outside the period of limitation. As long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117, 122 S.Ct. at 2074, 153 L.Ed.2d at 124. It is in this context that we consider the sufficiency of evidence to support each claim.

## IV. The Racial Discrimination Claim.

■ An essential element of a claim for racial discrimination in employment is that the claimant suffers an adverse employment action.[1] *See Sievers v. Iowa Mut.*

---

1. The basic elements of a prima facie case of discrimination in employment are: (1) plaintiff is a member of a protected class; (2) plaintiff was performing the work satisfactorily; and (3) plaintiff suffered an adverse employment action. *See Sievers v. Iowa Mut. Ins. Co.,* 581 N.W.2d 633, 638 (Iowa 1998). Under the *McDonnell Douglas* burden shifting analysis, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120 (2000); *accord Casey's Gen. Stores,*

*Ins. Co.,* 581 N.W.2d 633, 638 (Iowa 1998). Conduct constituting a materially adverse employment action embraces a wide variety of facts. *Channon v. United Parcel Serv., Inc.,* 629 N.W.2d 835, 862–63 (Iowa 2001). It includes subtle conduct such as depriving an employee of the opportunity to advance, as well as more obvious actions such as " ' "disciplinary demotion, termination, unjustified evaluations and reports, loss of normal work assignments, and extension of probationary period." ' " *Id.* at 863 (citation omitted). Internal transfers from department to department can also constitute adverse employment action when " 'accompanied by a negative change in the terms and conditions of employment,' " or when the transfers substantially affect future career prospects. *Terry v. Ashcroft,* 336 F.3d 128, 144 (2d Cir.2003) (citation omitted); *accord Channon,* 629 N.W.2d at 864–65. However, internal transfers involving " 'minor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action.' " *Spears v. Missouri Dep't of Corrections & Human Res.,* 210 F.3d 850, 853 (8th Cir.2000) (citation omitted). In other words, minor changes in working conditions that only amount to an inconvenience cannot support discrimination. *Id.* Our first task in this case is to examine the evidence concerning the six months prior to the time that Taylor filed his claim to determine if substantial evidence exists to support a finding that a discriminatory act occurred during this time period. If not, there is no actionable claim for racial discrimination.

■ Taylor presented evidence of four discrete events that took place during the relevant time period prior to the filing of

his complaint. The first occurred in the fall of 1997 when Taylor was recalled to the smoked meats department for a period of time. After being recalled, he was criticized by his supervisor, Sherman, for the slow pace of his work. Taylor acknowledged that his work was slow and that Sherman was motivated to increase production in the department. Yet, Taylor felt the criticism was unjustified because he was unfamiliar with the job he had been assigned. We do not believe occasional complaints voiced by a supervisor about employee performance standards constitute substantial evidence of a materially adverse employment action. Such a complaint alone cannot support a claim for racial discrimination.

■ The second event occurred in December 1997 when Taylor was laid off from the smoked meats department and assigned to the hog kill department. He was initially assigned various jobs he disliked, but soon requested and received the vacuuming job that he worked until April 6, 1998. We do not believe these circumstances amounted to substantial evidence of an adverse employment action. The changes experienced by the transfer and job assignments were a normal part of the overall employment, and did not support a claim for racial discrimination. Moreover, an employment action is not adverse merely because the employee does not like it or disagrees with it. *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir. 1997).

The third event occurred on April 6 and 7, 1998, when Taylor was removed from his vacuuming job and assigned a less desirable job to accommodate a worker with a lifting restriction. Like the other

*Inc. v. Blackford,* 661 N.W.2d 515, 519–20 (Iowa 2003). It is not necessary to follow the *McDonnell Douglas* analysis once a case has been fully tried because the burden ultimately

rests with the plaintiff to establish the claim and show the adverse employment action resulted from discrimination.

circumstances, these events did not constitute substantial evidence of a materially adverse employment action, but instead constituted a minor inconvenience. Moreover, there was no evidence Taylor lost money or benefits or that he would be unable to transfer back to his job at a later time. None of the actions cited by Taylor caused any material employment disadvantage.

The last event concerned Farmland's decision to recall all home base employees of the smoked meats department except Taylor. Additionally, Taylor believed that two employees from other departments had been transferred to the smoked meats department on a temporary basis. Taylor felt he was also entitled to be recalled. However, the evidence to support his belief that Farmland had transferred workers with less seniority than him was speculative. Taylor never observed any temporary or less senior employees working in the smoked meats department, and a coworker in the smoked meats department at the time, who was also a union steward, could not recall if any temporary workers were brought in to the department. Moreover, the human resources manager for Farmland testified that the company records showed no worker with less seniority than Taylor that was called back to the smoked meats department. Taylor also testified he complained to the union president about the recall, but there was no evidence that a grievance was ever filed. The record simply does not contain substantial evidence that the failure to recall Taylor to the smoked meats department constituted an adverse employment action. It did not result in material employment disadvantage. Additionally, the commission never made such a finding.

 It is also important to recognize that the essence of the complaints of discrimination by Taylor "strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its [resources] in response to shifting and competing market priorities." *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1244 (11th Cir.2001). This supports the position that work assignment claims that do not affect an employee's permanent job title or classification will not normally be actionable as adverse. *Id.*

Accordingly, we conclude Taylor failed to file his discrimination claim in a timely manner. There is no substantial evidence of a discrete act of discrimination within 180 days prior to the time the complaint was filed. Consequently, we do not consider the other evidence presented by Taylor to support his acts of discrimination as the commission did. Taylor cannot recover for claimed acts of discrimination outside the limitation period.

## V. The Hostile Work Environment Claim.

 Hostile work environment claims are actionable "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 301 (1993) (citation omitted). This claim recognizes workplace discrimination affects the full spectrum of disparate treatment in the workplace and targets discrimination that requires employees to work in a discriminatorily abusive or hostile workplace. *Id.* Such claims can be based on racial harassment, as was the claim brought by Taylor in this case.

 Before examining the sufficiency of the evidence to support the claim, we must address Farmland's assertion that

the hostile-work-environment claim was untimely. The four incidents we considered in examining the discrimination claim also make up a portion of the hostile-work-environment claim. Although these incidents do not give rise to adverse employment action, they constitute acts contributing to the hostile work environment claim. We have previously determined that these acts occurred within the 180–day limitation period. Accordingly, the hostile-work-environment claim was timely filed, and all the allegations of a hostile work environment made by Taylor throughout his employment are properly considered.

To establish a hostile work environment, the plaintiff must show: (1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment. *See Beard v. Flying J, Inc.*, 266 F.3d 792, 797 (8th Cir.2001). Additionally, if the harassment is perpetrated by a nonsupervisory employee, the plaintiff must show the employer "knew or should have known of the harassment and failed to take proper remedial action." *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 631 (8th Cir.2000). When a supervisor perpetrates the harass-

ment, but no tangible employment action occurred, the employer may assert the *Faragher–Ellerth* affirmative defense to avoid liability.[2] *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662, 689 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633, 655 (1998).

The harassment addressed in the elements of the claim refers, of course, to hostile-work-environment harassment that occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' ... 'sufficiently severe or pervasive to alter the conditions of the victims employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 301 (citation omitted). To establish whether harassment was severe or pervasive, the plaintiff must not only show he or she subjectively perceived the conduct as abusive, but that a reasonable person would also find the conduct to be abusive or hostile. *Id.* at 21–22, 114 S.Ct. at 370, 126 L.Ed.2d at 302. The objective determination considers all the circumstances, including: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or

---

**2.** If a plaintiff establishes a supervisor effected a tangible work action against the plaintiff, the defendant employer or corporate entity is liable for the harassment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662, 688–89 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764–65, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633, 655 (1998). However, if the plaintiff fails to establish that the supervisor took a tangible employment action, the employer may assert the *Faragher–Ellerth* affirmative defense. *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293, 141 L.Ed.2d at 689; *Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270, 141 L.Ed.2d at 655. The employer establishes this defense by showing it: (1) "exercised

reasonable care to prevent and correct promptly any ... harassing behavior," and (2) "that the plaintiff employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293, 141 L.Ed.2d at 689; *Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270, 141 L.Ed.2d at 655. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761, 118 S.Ct. at 2268, 141 L.Ed.2d at 652–53.

humiliating or whether it was merely offensive, and (4) whether the conduct unreasonably interfered with the employee's job performance. *Id.* at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302–03. These factors and circumstances must disclose that the conduct was severe enough to amount to an alteration of the terms or conditions of employment. *Faragher,* 524 U.S. at 788, 118 S.Ct. at 2283–84, 141 L.Ed.2d at 676–77. Thus, hostile-work-environment claims by their nature involve ongoing and repeated conduct, not isolated events. *Morgan,* 536 U.S. at 115, 122 S.Ct. at 2073, 153 L.Ed.2d at 123.

 The discriminatory intimidation, ridicule, and insult must be motivated by a worker's membership in a protected group. *See Harris,* 510 U.S. at 21–22, 114 S.Ct. at 370–71, 126 L.Ed.2d at 301–02. The use of racial epithets may not only support an inference of discrimination based on race, but may also support an inference that racial animus motivated other conduct. *Diaz v. Swift–Eckrich, Inc.,* 318 F.3d 796, 800–01 (8th Cir.2003) (relevant conduct need not be stamped with overt discrimination if it is part of a course of conduct tied to evidence of discriminatory animus).

 We find sufficient evidence that Taylor subjectively felt harassed. Thus, we turn to consider the sufficiency of the evidence under an objective inquiry using the factors we have identified.

 The commission found that the intensity and longevity of the repeated criticism and scrutiny by Sherman, as well as Farmland's unwillingness to alleviate the problem, supported the finding of a hostile work environment. It also found the undesirable job assignments given to Taylor supported the hostile work environment claim.

 We begin our review of the evidence by considering the nature of the conduct identified by Taylor to be racial harassment and the level or degree of its offensiveness. In doing so, we observe that the conduct by Sherman and other supervisors did not include the use of any racially derogatory statements. Instead, most of the conduct consisted of criticism and close supervision of Taylor's activities. Yet, occasional criticism of an employee's work performance by a supervisor, absent references or another nexus to race or national origin, does not amount to racial harassment. *See Hannoon v. Fawn Eng'g Corp.,* 324 F.3d 1041, 1047–48 (8th Cir. 2003). Moreover, antipathy between a supervisor and a black employee, absent evidence of racial discrimination, is not enough to establish a hostile work environment. *See Cooper v. John D. Brush & Co.,* 242 F.Supp.2d 261, 270 (W.D.N.Y. 2003). We also observe that there was no evidence of physical intimidation. There was also no evidence of racial harassment by supervisors and coworkers towards other employees, other than the general claim of graffiti in the employee restroom. This type of evidence, however, was nonspecific and not attributable to any time period.

Although Taylor earnestly believed Sherman was a constant source of harassment, the actual incidents claimed by Taylor to form the basis of the hostile work environment were sporadic and often separated by long gaps in time. Sherman's criticism of Taylor was also directed at production standards or work ethics. Taylor testified Sherman was the only supervisor or coworker who harassed him, but Taylor did not work under Sherman's supervision for any prolonged periods of time after Farmland took over the plant and reduced the smoked meats department.

Taylor also used the various job assignments to support the hostile-work-environment claim. However, there is no evidence that any job assignment was predicated on racial enmity or that Sher-

man had any control or input into Taylor's assignments in the hog kill department. Many of the jobs throughout the plant were undesirable, but they were regular jobs performed by other employees in the plant as well, and Taylor's seniority was frequently insufficient for him to avoid assignments to undesirable jobs.

We recognize that job transfers or assignments that give rise to adverse employment action can be a part of a hostile-work-environment claim. However, the transfers experienced by Taylor in this case were the result of the layoffs and did not affect his standing or classification in the plant. They were also temporary. Moreover, the specific work assignments related to staffing needs of the plant and the employer's judgment.

Considering all the evidence submitted by Taylor to support the claim of a hostile work environment, we conclude it was insufficient to support the conclusion of the commission. The conduct identified by Taylor to support his claim was not severe or pervasive, and did not permeate the work place environment with discriminatory intimidation, derision, and abuse. It was rather sporadic conduct, and often related more to the work required to be performed than the conduct of the employer. Taylor worked in an industry known for its tough jobs and unpleasant working environment, and many of his complaints related to the unpleasant nature of the jobs inherent in the work performed by the industry.

It is also important to recognize that Taylor's complaints normally subsided when he was assigned the jobs he did not find objectionable, and the entirety of his complaints were sporadic over the fifteen years of his employment. The specific criticism and scrutiny Taylor experienced from time to time was neither severe nor pervasive, and it did not impact the terms and conditions of his employment. *See*

*Freeman v. Kansas,* 128 F.Supp.2d 1311, 1320 (D.Kan.2001) (a supervisor may scold and yell at an employee without violating Title VII). We do not believe the occasional unpleasant treatment Taylor felt he received at the hands of his employer in this case was the type of conduct sought to be actionable under a hostile-work-environment claim. *See Harris,* 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 302 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.").

We acknowledge Taylor felt Sherman picked on him from time to time and that his feelings were generally confirmed by the beliefs of some of his coworkers. However, there is no evidence that Sherman or any other supervisor ever used any racially derogatory language and the conduct used to support the claim was neither severe nor pervasive. The evidence as a whole did not, as a matter of law, support a claim of a hostile work environment.

## VI. Conclusion.

We conclude the racial discrimination claim was not timely filed and that there was insufficient evidence to support the claim of a racially hostile work environment. The other claims were inadequately raised on appeal. We vacate the decision of the court of appeals and affirm the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except WIGGINS, J., who takes no part.