# IN THE COURT OF APPEALS OF IOWA

No. 15-0432
Filed October 12, 2016

**BEVERLY COUCH,**
　　　　Plaintiff-Appellant,

**vs.**

**IOWA DEPARTMENT OF HUMAN SERVICES,**
　　　　Defendant-Appellee.
_____

　　　　Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

　　　　An employee appeals the order granting summary judgment in favor of her employer on her claims of employment discrimination and harassment claims. **REVERSED AND REMANDED WITH DIRECTIONS.**

　　　　Leonard Bates, Thomas A. Newkirk, and Jill Zwagerman of Newkirk Zwagerman, P.L.C., Des Moines, for appellant.

　　　　Thomas J. Miller, Attorney General, and Barbara E.B. Galloway, Assistant Attorney General, for appellee.

　　　　Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

Beverly Couch claims her former employer, the Iowa Department of Human Services (DHS), engaged in employment discrimination and harassment against her based on her race and in retaliation for her participation in a civil rights lawsuit against the State of Iowa. She appeals from the district court order granting summary judgment in favor of the DHS. Because the evidence raises several genuine issues of material fact, we reverse and remand to the district court for further proceedings.

**I. Background Facts.**

Couch, whose position with the Iowa Department of Economic Development was terminated due to a budget reduction, was recalled for work with the DHS as an "Income Maintenance Worker 2" (IMW2) in the Child Care Assistance Unit (CCA). When he was notified of Couch's eligibility for recall, DHS Personnel Manager Chris Silberhorn recognized her name as one of the class representatives in a lawsuit that alleged the State of Iowa's employment practices had a discriminatory effect on African-American employees. Silberhorn was the DHS's representative in the lawsuit, which was scheduled to begin weeks after Couch's start on September 2, 2011. Before accepting the position, Couch informed Silberhorn that she would need time off to attend trial.

Immediately upon Couch's recall, DHS Supervisor Tracy Williams overheard Silberhorn informing someone that Couch had issues with filing discrimination complaints and suing the State in the past, but that "this time it wouldn't be an issue because he was placing her under [the direct supervision of] Angela Madison," who is African American. Silberhorn also made statements

about Couch's involvement in the lawsuit directly to Williams, who is also African American. Those statements left Williams with the impression that Couch "wasn't going to get a fair chance" in her position with the DHS. Couch eventually learned of Silberhorn's statements from another employee.

Couch used personal leave to attend trial on September 12, 13, and 14 as she had planned. However, on September 14 Couch received a subpoena to attend trial effective "until released," and she informed both Silberhorn and Madison of the subpoena and her need to take leave without pay "for the duration of trial if necessary." After receiving the request, Silberhorn asked Madison for her supervisory notes regarding counseling Madison for being eight minutes late during her first week of work. Silberhorn also complained to Pamella Stevenson, a human resources associate, that Couch had said she would need a few days off but then wanted to take leave for the entire trial, and that he was told to grant the request. Silberhorn wrote: "We are not happy, about the situation, but I have learned we will not be posting anything to external without posting internal first and taking a close look at our options." When Stevenson expressed concern that Couch would use her absence during trial as an excuse if she did not meet her probationary expectations, Silberhorn responded, "I won't let her—[Madison] is going to train [Couch] herself." Silberhorn made a similar comment during a meeting attended by Madison and Williams, stating he was glad Madison was supervising Couch because "there wouldn't be an issue when she was let go." Williams interpreted his statement to

mean that Couch would not be able to complain of discrimination because both she and Madison are African American.[1]

In the weeks after Couch began working for the DHS, Williams continued to overhear Silberhorn "frequently ma[king] inappropriate comments about the class action lawsuit" that Williams believed "clearly expressed resentment that . . . black claimants filed a lawsuit against his employer." Silberhorn also made disparaging comments about Couch's work ethic and performance. Williams reported the comments to Service Area Supervisor Denise Gonzalez, Silberhorn's supervisor, on September 27, 2011. The following day, Gonzalez told Silberhorn that his comments were "inappropriate and [were] not acceptable," but no disciplinary action was taken.

Trial ended on October 2, 2011, and Couch returned to work feeling "shameful," "mentally distressed," and "devastated" because she had learned of Silberhorn's comments to others, which she believed "belittled" her. Couch testified that based on his comments, she knew Silberhorn "had a vendetta" against her and "had his purpose in mind . . . to get rid of [her]." Couch had difficulty focusing on her work as a result.

On October 12, 2011, in response to Madison's question about why she had made errors in calculating child-support income, Couch complained about her lack of training after being in trial. On the same day, Couch also expressed concern to Madison about the comments Silberhorn had made. Madison told

---

[1] Silberhorn claims his comment did not pertain to the women's race, but rather to his belief Madison was the more "easy going" of the two supervisors in the child care assistance unit. However, Couch asserts Madison was the "toughest" supervisor, and there is record evidence that could support such a finding.

Couch that she was receiving "on the job" training, and that she did not want to hear about Silberhorn's comments because it was "personal," not a work matter. Couch felt Madison "blew off" her concerns. The record shows that although income maintenance workers typically receive standard training within two weeks of starting employment, Couch did not begin training until November 7, 2011—more than two months after her employment began and more than one month after the trial concluded.

By December 2011, DHS managers, including Silberhorn, were discussing Couch's termination.[2] On December 7, 2011, Gonzales sent an email to Kimberly Anderson, the income maintenance administrator, with the subject "Beverly Couch." In the email, Gonzales noted the IMW2 job description did not list performance goals for the position and that there was insufficient data to establish an average performance for the unit at that time. Gonzales asked Anderson how Couch was doing compared to other new employees and wondered, "How can I establish that [Couch] is not meeting the expectations if I do not know how others do?" Anderson responded that there were no other probationary employees at that time but offered to obtain the data of an income maintenance worker who had recently transferred to the child care assistance unit for comparison. She also noted Madison had "stated that she has let other probationary employees go in the past for less" and asked Gonzales if they could "use that as an argument" to terminate Couch.

---

[2] The evidence indicates that it typically takes new employees between three and six months to learn the job duties of an income maintenance worker. Couch's termination was discussed no later than three months after she began the job. When the time she was absent for trial is deducted, Couch had only been in the position two months by December 2011 and had received formal training less than one month before.

Though there is no direct evidence of what precipitated it, Silberhorn emailed Gonzales a document named "Return to recall" on December 13, 2011, stating: "You had asked about this template a while ago." The document, a draft of a letter bearing the date of November 17, 2011,[3] with Madison's name and title listed below the signature line, reads as follows:

> Dear ???;
> This letter is to inform you that effective today you are being returned to the recall list for your failure to successfully complete the probationary period following recall.
> Even after completion of training, your error rate is not at the level where we are confident that you are able to perform the duties of the position of Income Maintenance Worker 2. You continue to make mistakes with even simple mathematical issues such as calculating an average weekly pay amount or determining whether or not someone is in school.
> In accordance with the (AFSCME or UE/IUP) collective bargaining agreement, your name will be returned to the recall list for a period of two years.
> You have no right of appeal of this action.
> If you have any questions, or if you need further information, please contact me.

Although the letter is not addressed to Couch, the details set forth indicate it was drafted in anticipation of her termination. Madison testified she did not recall ever signing a termination letter and had not requested that one be drafted.

On December 27, 2011, Madison drafted an email intended for Anderson with the subject line "Beverly Couch— Training, Case Read Results, and Specific Errors Write-Up." Madison stated she was attaching information that had been requested and concluded, "I hope this covers everything. If I need to make

---

[3] The data embedded in the file shows it was created on November 2, 2011. Assuming the document was created on this date in the same form it was emailed to Gonzales, as Couch argues, the document is significant because it was created before Couch received training for the IMW2 position, and the letter was dated just one week after her training would have been scheduled to end.

adjustments, please let me know." The attached document, which is ten single-spaced pages in length, detailed forty-nine specific errors found in Couch's case readings and stated Couch's accuracy rating was fifty-nine percent, while the accuracy rating for the entire unit was seventy-four percent.[4] Madison inadvertently sent the email to Couch, who replied to again express her belief that she had not been adequately trained for the IMW2 position.

Couch submitted a complaint to DHS Director Charles Palmer on January 2, 2012, alleging she had been prejudged based on her race. Couch recounted the comments Silberhorn made about her and noted she was unaware of what action, if any, the DHS had taken regarding his comments. She also alleged her training as an IMW2 was inadequate.[5] Also that month, Couch also had a meeting with Gonzales and Anderson after suffering an anxiety attack following a conversation with Madison. At that meeting, Couch detailed what she considered to be the deficiencies in her training and the difficulties she was having with Madison. Anderson later responded in a letter, setting out nine "concerns" Couch had raised and refuting each.

Couch again complained about Madison's treatment of her, stating that several co-workers had commented that Madison treated her differently than other employees, echoing this sentiment, and explaining that Madison's treatment made her feel "very uncomfortable." On January 25, 2012, Gonzalez

---

[4] All cases assigned to probationary workers are reviewed by a supervisor. Madison testified she had a goal of reviewing at least one case per month for the workers who were not on probation. The accuracy rating of the income maintenance worker who transferred to the unit was seventy-seven percent, higher than the department's average.

[5] In an email on January 12, 2012, Chief Financial Officer Jean Slaybaugh told Couch: "Rest assured that we are proceeding with review of the situation you contacted me about on January 2nd." Couch was terminated before the investigation was concluded.

placed Couch on administrative leave in order to "review everything that was going on" with Couch's complaints. Gonzales determined that Couch was unable to perform the essential functions required to be an IMW2 and, on January 30, 2012, terminated Couch for failing to successfully complete probation.

Couch filed a petition alleging the DHS had subjected her to discrimination and harassment based on her race and in retaliation against her for her involvement in a civil rights lawsuit against the State. The DHS denied the allegations. Following a motion by the DHS, the district court granted summary judgment in favor of the DHS on each of Couch's claims. Couch appeals.

**III. Scope and Standard of Review.**

We review the district court's grant of summary judgment for correction of errors at law. *See Barker v. Capotosto*, 875 N.W.2d 157, 161 (Iowa 2016). To succeed on a motion for summary judgment, the moving party must show the material facts are undisputed and, applying the law to those facts, the moving party as entitled to judgment as a matter of law. *See id.*; *Nelson v. Lindaman*, 867 N.W.2d 1, 6 (Iowa 2015). We review the facts in the light most favorable to the nonmoving party, which is entitled to every legitimate inference that may be drawn from the record. *See Nelson*, 867 N.W.2d at 6. A question of fact exists if the evidence could lead reasonable minds to differ on how an issue should be resolved. *See Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 771 (Iowa 2009). "Our review 'is limited to whether a genuine issue of material fact exists and whether the district court correctly applied the law.'" *Id.* (citation omitted).

**IV. Analysis.**

Couch alleges the DHS discriminated against her with respect to the terms and conditions of her employment and subjected her to harassment based on her race and in retaliation for her prior involvement in a civil rights case against the State. She argues the district court erred in granting summary judgment in favor of the DHS because there are genuine issues of material fact in dispute.

**A. Discrimination Claims.**

Iowa law prohibits terminating or discriminating against an employee based on the employee's race or in retaliation for lawfully opposing discriminatory practices or filing a proceeding under the ICRA. *See* Iowa Code §§ 216.6(1)(a), 216.11(2) (2011). Couch alleges she was discriminated against both based on her race and in retaliation for her involvement in the class-action lawsuit against the State.[6]

To succeed on her discrimination claims, Couch must show she suffered an adverse employment action. *See Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 741 (Iowa 2003). An adverse action is one that detrimentally affects the terms, conditions, or privileges or employment. *See Channon v. UPS*, 629 N.W.2d 835, 862 (Iowa 2001). Although "minor changes

---

[6] The DHS argues Couch waived error on this claim because she did not raise it before the ICRC and therefore did not exhaust her administrative remedies. *See Keokuk Cty. v. H.B.*, 593 N.W.2d 118, 122 (Iowa 1999). However, we construe the civil rights complaint filed with the ICRC liberally to further the remedial purpose of the civil rights law. *See McElroy v. State*, 703 N.W.2d 385, 390 (Iowa 2005). Therefore, Couch has exhausted administrative remedies if the allegations contained in her petition are like or reasonably related to the substance of charges brought before the ICRC. *See id.* We find they are. In her complaint, Couch alleged "failure to train, . . . harassment, . . . and termination due to her race." She also alleged the DHS retaliated against her "by means of failure to train and termination." Because the allegations in her petition are reasonably related to the charges she brought in her ICRC complaint, Couch exhausted her administrative remedies.

in working conditions that only amount to an inconvenience" will not support a discrimination claim, Couch's termination undoubtedly qualifies as an adverse employment action within the ICRA's definition. *See Farmland Foods*, 672 N.W.2d at 742 (noting that adverse employment action embraces a wide variety of facts, including "obvious actions" like termination).

Couch must also show the adverse employment action was motivated by her employer's discriminatory animus or intent. *See Pippen v. State*, 854 N.W.2d 1, 9 (Iowa 2014). Discriminatory intent may be shown by either direct or indirect evidence. *See Reiss v. ICI Seeds, Inc.*, 548 N.W.2d 170, 174 (Iowa Ct. App. 1996). Couch is alleging there is direct evidence of discriminatory intent. Direct evidence of discriminatory intent exists where there is "credible evidence of conduct or statements of supervisors which may be seen as discrimination sufficient to support an inference that the discriminatory attitude was a motivating factor." *Vaughn v. Must, Inc.*, 542 N.W.2d 533, 538 (Iowa 1996). Discriminatory intent need not be the sole factor; "the plaintiff need only demonstrate 'termination occurred under circumstances giving rise to an inference of discrimination' and his or her status as a member of a protected class was a determining factor in the decision to terminate employment." *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009) (citation omitted) (noting the different causation standard applied in discrimination cases compared to the standard applied in tortious discharge cases).

The district court held that Silberhorn's statements "constitute direct evidence that Silberhorn did not believe Couch was a competent employee and they establish, at least inferentially, that Silberhorn harbored animosity toward

Couch because she participated in the lawsuits against the State." For purposes of ruling on the motion for summary judgment, the court accepted that the statements also adequately supplied the basis for an inference that Silberhorn harbored animus toward Couch based on her race. However, because it found there was a lack of evidence showing Silberhorn was involved in any adverse employment action, the court determined Silberhorn's comments amounted to nothing more than "stray remarks" by a non-decision-maker, which are insufficient to establish discriminatory animus. *See Rivers-Frison v. Se. Missouri Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998) (stating stray remarks by non-decision-makers are insufficient to establish discriminatory animus because there is no causal connection between the remarks and the adverse employment action).

If Silberhorn was involved in the decision to terminate Couch, his comments would be sufficient to establish discriminatory animus. Although the record does not show, nor does Couch assert, that Silberhorn made the ultimate decision to terminate Couch, when the evidence is viewed in the light most favorable to her, it generates a question of fact on the issue of Silberhorn's involvement in or influence over Couch's termination. Silberhorn was present in meetings with Madison and the other income maintenance supervisor, and personnel issues—including Couch's potential termination—were discussed. During those meetings, Silberhorn made it known that he anticipated Couch's termination. The evidence further indicates Silberhorn discussed Couch with Madison and Gonzales before Madison drafted the document detailing the errors in Couch's case reads and formally recommending her termination. For

example, Silberhorn knew Madison counseled Couch for being eight minutes late to work because he requested Madison's supervisory notes on that counseling while considering whether to grant Couch's request for unpaid leave. Additionally, Gonzales asked Silberhorn to supply her with a draft of a termination letter,[7] which Silberhorn was able to do using specific facts about Couch's performance. Considering any and all inferences that may reasonably be made in favor of Couch, the evidence shows Silberhorn discussed Couch's performance and had the ability to influence Couch's termination before Madison's recommendation.

Although evidence that Silberhorn was involved in the ultimate decision to terminate Couch would establish discriminatory animus, Couch is not *required* to show Silberhorn was responsible for or directly involved in her termination to survive summary judgment. If Silberhorn took adverse employment action against Couch with discriminatory intent, and his actions influenced the decision to terminate her, Couch has generated a fact question on the issue of discriminatory animus. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 413, 420 (2011)[8] (holding an employer is liable for discrimination in terminating an

---

[7] Though Silberhorn's email to Gonzales states he was providing the document as she requested, we have no similar "paper trail" of the request for the draft of the termination letter. Presumably, Gonzales requested the draft by other means—either in person or by telephone. Because Silberhorn was able to include what appear to be specific details of Couch's performance in the draft, it is reasonable to infer Gonzales communicated those details to Silberhorn during the same discussion or in others, or that Silberhorn knew the information based on his involvement in the meetings with the income maintenance supervisors. Regardless, one can reasonably conclude Silberhorn had conversations with other management employees about Couch's performance and termination.

[8] Although *Staub* concerns the Uniformed Services Employment and Reemployment Rights Act, the Supreme Court noted that statue "is very similar to Title VII," 562 U.S. at 417, which the ICRA is modeled after, *see Deboom*, 772 N.W.2d at 10.

employee, even though the ultimate decision-maker held no discriminatory animus, if the decision to terminate was influenced by an employee who held discriminatory animus and engaged in an adverse act that was intended to lead to termination). Couch alleges Silberhorn engaged in two adverse acts calculated to lead to her termination: (1) he assigned Couch to Madison and (2) he ensured she would receive less training. Although there is evidence to refute Couch's claim that Silberhorn was responsible for assigning Couch to Madison's supervision, his own statements indicate not only that he made the decision, but that he did so specifically with an eye toward her termination. In a meeting with the income maintenance supervisors, Silberhorn reportedly said he assigned Couch to Madison so there would not be an issue *when*—not *if*—she was terminated. Couch also alleges the assignment of Madison to be her supervisor increased the likelihood of her termination due to Madison's reputation as the tougher of the two supervisors to which she could have been assigned.

There is also evidence indicating Silberhorn was involved in Couch's training, which Couch consistently maintained was inadequate and a large factor in her performance, which eventually led to her termination. The description of Silberhorn's position states his job duties include serving as the area's training liaison to "provide guidance and feedback in the development and implementation of training plans and goals, conduct presentations, [and] authorize training requests," suggesting, albeit weakly, that he had input on Couch's training.

Viewing the evidence in the light most favorable to Couch, it is sufficient to generate a fact question on the issue of whether Silberhorn was directly involved

in or influenced Couch's termination. Accordingly, we reverse the grant of summary judgment in favor of the DHS on Couch's discrimination claims.

### B. Harassment Claims.

Couch also claims she was subjected to hostile-environment harassment based on her race. To succeed on her claim, Couch must establish: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic—in this case, her race; and (4) the harassment affected a term, condition, or privilege of employment. *See Farmland*, 672 N.W.2d at 744-45.

A hostile work environment exists if "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult'" that is "sufficiently severe *or* pervasive to alter the conditions of the victims employment and create an abusive working environment." *Id.* (emphasis added) (citations omitted). Couch must establish not only that she subjectively perceived the conduct as abusive, but that a reasonable person would also find the conduct to be abusive or hostile. *See id.*

The evidence clearly establishes Couch subjectively perceived her work environment to be hostile. Couch testified she experienced mental distress after learning of Silberhorn's comments and that she had difficulty focusing on her job as a result. As the United States Supreme Court has recognized, "a discriminatorily abusive work environment . . . can and often will detract from employees' job performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). Couch alleged Silberhorn's comments detracted from her ability to

perform her job months before Gonzales made the ultimate decision to terminate her employment.

The question before us is whether there is sufficient evidence to generate a question of fact on Couch's claim her work environment was objectively hostile based on Silberhorn's comments alone.[9]  In making the determination of whether a work environment is objectively hostile,[10] we consider all the circumstances, including: "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or humiliating or whether it was merely offensive, and (4) whether the conduct unreasonably interfered with the employee's job performance."  *Farmland*, 672 N.W.2d at 744-45.

Viewing the evidence in the light most favorable to Couch, we find a fact question exists regarding whether a reasonable person would find Silberhorn's comments sufficient to create a hostile work environment.  Based on those comments, Couch understood from practically the start of her employment with the DHS that Silberhorn, the personnel manager, both anticipated her failure and, worse, set her up to fail.  Drawing the inferences from Silberhorn's statements in favor of Couch supports a finding that the comments were based on her race and in retaliation for her participation in a civil rights lawsuit against the State.  Though Silberhorn made comments to this effect on several occasions, they

---

[9] Although Couch also complained several times about Madison's treatment of her during her employment with the DHS, Couch made no claim Madison engaged in harassment against her based upon her race or in retaliation for her involvement in a civil rights lawsuit against the State.

[10] Several federal circuit courts of appeals have held the determination of whether harassment is severe or pervasive in nature "is particular unsuited for summary judgment because it is 'quintessentially a question of fact.'"  *See O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (quoting *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir.1994)); *cf. Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006).

cannot be considered pervasive. Nor were his comments vulgar. However, a reasonable person could find a superior's comments anticipating a new employee's failure based on discriminatory animus or in retaliation for that employee making a civil rights complaint to be severe and humiliating. Such comments could also affect a reasonable person's ability to succeed in training for and performing the new job. As a result, we reverse the portion of the district court's order granting summary judgment in favor of the DHS on Couch's harassment claims.

Having reversed the district court's summary judgment ruling in its entirety, we remand for further proceedings.

**REVERSED AND REMANDED WITH DIRECTIONS.**