# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3065

_____

| | |
|---|---|
| Thomas Woodland, | * |
| | * |
| Plaintiff - Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * District of Minnesota. |
| Joseph T. Ryerson & Son, Inc., | * |
| | * |
| Defendant - Appellee. | * |

_____

Submitted:  May 17, 2002

Filed:    September 11, 2002

_____

Before LOKEN, HEANEY, and MURPHY, Circuit Judges.

_____

LOKEN, Circuit Judge.

Thomas Woodland sued his employer, Joseph T. Ryerson & Son, Inc., alleging unlawful race and age discrimination and retaliation in violation of federal and Minnesota anti-discrimination laws.  The district court[1] granted summary judgment dismissing Woodland's claims.  We review the grant of summary judgment de novo, applying the same standards as the district court.  See Robinson v. Valmont Indus., 238 F.3d 1045, 1047 (8th Cir. 2001).  We affirm.

_____

[1]The Honorable DONOVAN W. FRANK, United States District Judge for the District of Minnesota.

Woodland, an African American man with more than twenty years experience in the steel industry, was hired in February 1990 as a laborer at Ryerson's unionized facility in Plymouth, Minnesota. When Woodland was hired, he was the only African American production worker at this facility. His hiring came on the heels of an audit by the United States Office of Federal Contract Compliance, which found that Ryerson had failed to interview "potentially qualified, minority production applicants." Woodland proved to be a competent, hard-working employee, and he has served for many years as a steward at the plant for Local 61U-18 of the United Steelworkers of America. Because Woodland asserts a variety of discrimination claims,[2] we will set out additional background facts as we discuss each claim, taking Woodland's evidence as true and drawing all justifiable inferences in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## I. Discrimination in Hiring, Promotion, and Lay-offs.

Woodland first applied for a job at Ryerson in 1988 but was not interviewed. Ryerson hired four white males between Woodland's first application and his eventual hiring nineteen months later following the federal agency audit. Ryerson's collective bargaining agreement with the Steelworkers union provided that promotion, overtime, and lay-off decisions would normally be based upon seniority. Woodland's seniority began with his hire in February 1990. Woodland testified that he unsuccessfully bid for a promotion to laser operator in September 1994, was not awarded overtime hours on numerous occasions, and was laid off twice in the 1990s,

---

[2] Woodland asserts claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*; 42 U.S.C. § 1981; Title VII, 42 U.S.C. § 2000e-2 *et seq.*; the Minnesota Dismissal for Age Act, Minn. Stat. § 181.81 *et seq.*; and the Minnesota Human Rights Act, Minn. Stat. § 363.01 *et seq.* He has not a scintilla of evidence supporting the age discrimination claims, so we focus our analysis on his race discrimination and retaliation claims.

all because he had less seniority than the four white employees hired after his initial job application. Woodland seeks damages for earnings lost as a result of his inadequate seniority, arguing those losses were caused by Ryerson's discriminatory failure to hire him in 1988. The district court dismissed these claims as time-barred. We agree.

These claims are based on Woodland's contention that Ryerson discriminated against him on account of his race when he was not interviewed and hired in 1988. Even if the allegation is accurate, the refusal to hire was a single, discrete act, not a continuing violation, so any challenge to this event is obviously time-barred. See Herrero v. St. Louis Univ. Hosp., 109 F.3d 481, 486 (8th Cir. 1997). When Woodland was finally hired in February 1990, his seniority was based upon his date of hire, in accordance with a collectively bargained, non-discriminatory seniority system. Thus, his alleged "loss" of seniority was due entirely to the 1988 refusal to hire. Likewise, when lack of seniority cost Woodland a promotion, overtime hours, and two lay-offs in later years, these were adverse consequences of a single alleged act of discrimination, the 1988 refusal to hire.

Woodland argues that he may recover damages for these later effects of the 1988 discrimination because they occurred during the limitations period. But this contention is contrary to controlling Supreme Court cases. In United Air Lines, Inc. v. Evans, 431 U.S. 553 (1977), the Court considered the claim of a flight attendant who was forced to resign when she married and sued to recover damages for the resulting lack of seniority when she was rehired many years later. The Court held the claim time-barred because the employer's seniority system was non-discriminatory and therefore no present violation existed. "[A] challenge to a neutral system may not be predicated on the mere fact that a past event which has no present legal significance has affected the calculation of seniority credit, even if the past event might at one time have justified a valid claim against the employer." 431 U.S. at 560. Accord National R.R. Passenger Corp. v. Morgan, 122 S. Ct. 2061, 2071-72 (2002).

-3-

## II. Hostile Work Environment.

At his lengthy deposition, Woodland testified that the Ryerson plant was rife with co-worker racial hostility that created for him an unlawful hostile work environment. A claim of hostile work environment based on co-worker harassment requires proof that Woodland was the target of severe or pervasive harassment on account of his race; that the harassment affected a term, condition, or privilege of his employment; and that Ryerson knew or should have known of the racial harassment and failed to take adequate remedial measures. See Carter v. Chrysler Corp, 173 F.3d 693, 700 (8th Cir. 1999). This standard is relatively stringent:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

> \*   \*   \*   \*   \*

> [W]hether an environment is hostile or abusive can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23 (1993). Merely offensive conduct is not enough absent the requisite effect on the terms or conditions of employment. Title VII does not "impose a code of workplace civility." Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 567 (8th Cir. 2000).

-4-

Woodland testified that some ninety percent of the predominantly white work force was "racist," though he declined to define the term. He further testified that the following incidents occurred over the course of a four- or five-year period:

• On three occasions, a co-worker told Woodland that another employee had used a racial epithet in referring to him. Woodland did not report these incidents to his supervisors, but on one occasion a foreman heard the comment and reported it to the plant manager, Mark Renaud. Renaud told Woodland, "all I need you to do, Tom, is come in and sign a complaint against him and I'll fire him." Woodland told Renaud he would rather just forget about it.

• On two other occasions, Woodland as union steward heard about racial epithets directed at other African American employees. He advised those employees either to do nothing or to report the conduct to a supervisor. The one time an incident was reported, management told the offending employee that if he did not cease using such terms he would be fired.

• On another occasion, a co-worker made an obscene gesture when Woodland said he should get back to work. There was no apparent racial connotation to the gesture. A foreman reported the behavior to Renaud, who offered to fire the offensive employee. Again, Woodland asked Renaud not to fire him.

• Several years ago, copies of a "poem" with racist, sexist, and homophobic messages were strewn about the plant. Management immediately collected and disposed of the copies. In 1996, racist graffiti -- drawings of "KKK," a swastika, and a hooded figure -- appeared on the walls of one of the men's restrooms at the plant. Woodland brought the graffiti to the attention of management. He was furnished spray paint to cover the graffiti. Plant manager Thomas Eckert called a meeting and explained such graffiti would not be tolerated. The plant operations manager later

posted flyers warning that anyone placing inappropriate literature on the walls would be disciplined severely. Woodland testified the misbehavior stopped.

While the co-worker conduct described by Woodland was certainly offensive, we agree with the district court that "Woodland has failed to provide sufficient evidence from which a reasonable fact-finder could conclude that Woodland endured severe and pervasive racial hostility, that Ryerson knew or should have known of such hostility, and that Ryerson did nothing about it." Woodland chose not to report many of the incidents about which he now complains. When two of the incidents were reported by others, Woodland declined the plant manager's offer to fire the offending co-worker. This is strong evidence that, while offensive, these incidents did not subjectively affect the conditions of Woodland's employment. The racial graffiti found in the men's restroom was inexcusable behavior (probably done by a co-worker), but Woodland volunteered to clean up the restroom, and management took decisive steps to end such misconduct. Similarly, Ryerson acted promptly to remove derogatory poetry that on one occasion was strewn around the plant.

After careful review of the record, in particular Thomas Woodland's lengthy deposition testimony, we conclude that, as in Gipson v. KAS Snacktime Co., 171 F.3d 574, 579 (8th Cir. 1999), the sporadic racially-motivated misconduct by his co-workers was "neither severe nor pervasive enough to create a hostile work environment." And as in Robinson, 238 F.3d at 1047-48, the summary judgment record also establishes the promptness and adequacy of Ryerson's responses to those incidents of co-worker harassment that were brought to management's attention.

### III. Disparate Treatment.

Woodland also alleges that throughout his time at Ryerson, minority employees were subject to disparate treatment, specifically, more aggressive enforcement of drug testing and substance abuse policies and safety regulations. However, Woodland has

never incurred involuntary drug testing, or discipline for substance abuse, or a sanction for refusing to wear safety equipment. Thus, the district court correctly concluded that he presented no evidence that he has been treated less favorably than similarly situated white employees. See Palesch, 233 F.3d at 568.

## IV. Retaliation Claims

At various times over the years, Woodland complained about the lasting effects of Ryerson's failure to hire him when he first applied in 1988. In the fall of 1998, Ryerson manager John Rich offered Woodland $12,500 to settle any and all past claims against Ryerson. On the advice of counsel, Woodland did not accept this offer and sign the written release proposed by Ryerson. Woodland alleges that Ryerson unlawfully retaliated against his protected activity in rejecting the settlement offer when Rich "hounded" Woodland to repay a $500 personal loan that Ryerson made in 1998, when Woodland was facing financial hardship. Woodland also alleges that Ryerson retaliated against him for filing this lawsuit by reassigning him from Bay 2 to Bay 6 when Woodland had health concerns about the Bay 6 work station.

A prima facie case of unlawful retaliation requires a showing that the employee engaged in some form of protected activity, that the employee was subject to adverse employment action, and that the adverse action was causally connected to the protected activity. See Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997). The district court dismissed the retaliation claims because Woodland failed to present evidence of an "adverse employment action." We agree. Assuming Ryerson's settlement offer could ever be construed as potentially unlawful retaliation, Woodland suffered no adverse consequences because he refused the offer. The $500 personal loan was a benefit to Woodland. When the loan became overdue, Ryerson's demand that it be repaid cannot be unlawful retaliation because Woodland presented no evidence of disparate treatment, that is, evidence that other employees received personal loans that Ryerson forgave when they became overdue. Finally, Woodland's

reassignment to Bay 6 -- which Ryerson explained was done to fill a vacancy on the team fulfilling an important contractual commitment because Woodland was the most capable employee for the job -- caused no change in Woodland's title, salary, benefits, or duties. "[C]hanges in duties or working conditions that cause no materially significant disadvantage . . . are insufficient to establish the adverse conduct required to make a prima facie case." Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997). It is clear Woodland did not like the reassignment, but he presented no evidence that his health concerns were well-founded. "[N]ot everything that makes an employee unhappy is an actionable adverse action." Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359-60 (8th Cir. 1997).

For the foregoing reasons, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-8-