Nathan A. MARTIN, Plaintiff,

v.

CHAMPION FORD, INC., Defendant.

No. C13–3041–LTS.

United States District Court,
N.D. Iowa,
Central Division.

Signed Aug. 28, 2014.

R. Scott Rhinehart, Rhinehart Law, PC, Sioux City, IA, for Plaintiff.

Jeff W. Wright, Rosalynd Jean Koob, Heidman Law Firm, LLC, Sarah Kuehl Kleber, Heidman Redmond Fredregill Patterson Plaza Dykstra & Prahl, Sioux City, IA, for Defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

LEONARD T. STRAND, United States Magistrate Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ............................................... 749

II. PROCEDURAL HISTORY .............................................. 749

III. RELEVANT FACTS ................................................ 750

IV. SUMMARY JUDGMENT STANDARDS .................................... 753

V. ANALYSIS ....................................................... 755
   A. Hostile Work Environment ....................................... 755
     1. Did the harassment affect a term, condition or privilege of Martin's employment ...................................... 756
     2. Would Champion be liable for the harassment ..................... 760
   B. Race Discrimination ............................................ 761

VI. CONCLUSION ................................................... 763

## I. INTRODUCTION

This case is before me on a motion (Doc. No. 22) for summary judgment filed by defendant Champion Ford, Inc. (Champion), and a motion (Doc. No. 26) for partial summary judgment filed by plaintiff Nathan A. Martin (Martin). Both motions are resisted. I heard oral arguments on July 23, 2014. R. Scott Rhinehart appeared and argued for Martin. Jeff W. Wright appeared and argued for Champion. The motions are fully submitted.

## II. PROCEDURAL HISTORY

Martin filed his complaint and jury demand (Doc. No. 2) on August 16, 2013, and

filed an amended complaint (Doc. No. 12) two months later. In his complaint, as amended, Martin contends that he was employed by Champion and that, during his employment, he was subjected to harassment and discrimination based on his race. He asserts the following causes of action:

Count I: Racial Discrimination (federal)

Count II: Hostile Work Environment (federal)

Count III: Racial Discrimination (state)

Count IV: Hostile Work Environment (state)

Doc. No. 12.

Champion denies Martin's operative factual allegations, denies liability and asserts various affirmative defenses. Doc. No. 15. This case was referred to me after the parties unanimously consented to trial, disposition and judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(3). Doc. No. 16. Trial is scheduled to begin October 1, 2014. Doc. No. 17.

### III. RELEVANT FACTS

Except as otherwise noted, the following facts are not in dispute:

**Background.** Champion is an Iowa corporation that operates a Ford dealership in Carroll, Iowa. Martin is an African–American male who was employed by Champion from March 2010 until June 6, 2012. During that time, Champion had approximately 20 employees, with Martin being the only minority.

Martin was initially hired as a detail technician but was promoted to detail manager approximately two weeks into his employment, when the previous detail manager died. His job duties included cleaning vehicles, taking out garbage, keeping his work area clean, picking up and dropping off customers' vehicles for oil changes and organizing Champion's lot.[1] Champion received no complaints about Martin during his employment and does not contend that his work performance was deficient.

Champion is owned by Ken Payer and has two departments—sales and service. During Martin's employment, Roger Tapps was service manager and Jake Petzenhauser was sales manager. According to Payer, Martin's detail position was split equally between the sales and service departments.

Champion maintains an employee handbook that includes, among other things, a policy prohibiting harassment and discrimination based on race. Martin contends that he was never provided a copy of the handbook and was not made aware of Champion's anti-harassment and anti-discrimination policy during his employment.[2] Champion disputes this and contends that its practice was to provide all employees with a copy of the handbook and to review it with each new employee. Martin notes it is undisputed that his personnel file, unlike two others produced by Champion, contains no signed acknowledgement evidencing receipt of an employee handbook.

**Racial Slurs.** Martin contends that while he was employed at Champion, other

---

1. Martin appears to contend that these were his *only* job duties, while Champion contends that these were simply the duties for which Martin was accountable.

2. Martin states that no posters or notices were displayed at Champion to advise employees not to discriminate and cites to Payer's deposition, during which he testified to the lack of any such posters or notices. Doc. No. 26–3 at 120. In response, Champion has submitted photographs of posters that are allegedly on display at Champion but cites to no part of the record supporting its assertion that the posters were present during Martin's employment.

employees used racial slurs in his presence. The only example he provides is that a tool normally called a "breaker bar" was sometimes called a "nigger bar." Martin testified that two different employees used that term "once or twice" each. He did not complain to anyone about the use of the term.

*The Schultes Text Messages.* Tony Schultes was a co-worker employed by Champion as a service technician. Schultes sometimes forwarded text messages to Martin that Schultes apparently considered to be humorous. By contrast, Martin contends he never sent text messages to Schultes.[3] On December 23, 2011, Martin received a text message from Schultes that included a photograph of three burning crosses and Santa Clause in a Ku Klux Klan hood with a caption stating "Have a white Christmas." Schultes admits that he sent this text message (hereafter, the "white Christmas message") to Martin.

It is undisputed that Schultes had previously sent at least one other racially-themed text message to Martin—a message that depicted a black man running from the Ku Klux Klan with a caption stating "wrong party" and playing a parody to a song called "You Should Have Seen It in Color." Martin also claims that Schultes sent two additional racially-themed messages prior to December 23, 2011. One depicted a young black male crying with a KFC sign in the background that said "Closed." Martin assumed this was a reference to "the whole fried chicken/watermelon thing." The other text showed a black male child climbing over a fence with a caption stating "In training

for the penitentiary." Martin does not claim that he reported either of these texts to Champion and Champion states that it had no knowledge of them.

While Martin did not complain to Champion about any messages sent by Schultes before December 23, 2011, he contends that he did tell Schultes on a prior occasion that he did not consider the race-themed text messages to be funny. Champion states that it has no knowledge of this alleged conversation.

On December 24, 2011, Martin complained to Payer about the white Christmas message and showed him the message. Payer conducted a meeting that day with Martin, Schultes and Tapps (the service manager). Schultes was given a written reprimand, suspended for half a day without pay, ordered to apologize to Martin and warned that he would be discharged if anything similar happened again. It is undisputed that after this meeting, Tapps directed Martin to delete all text messages and other information in his phone relating to Schultes.

Champion claims it further responded to the incident by conducting an employee meeting to discuss the importance of avoiding discrimination in the workplace and to make it clear that Martin was to be treated with respect. Martin denies having knowledge of the meeting and notes that two employees have testified, by deposition, that they have no recollection of the meeting.

*The Aftermath.* Martin contends that he was treated differently at Champion after he complained to Payer about the white Christmas message. He claims he was generally shunned, in the sense that

---

**3.** Champion claims Martin has contradicted himself on this point, alleging that he admitted in an affidavit that he sent text messages to Schultes. However, while the affidavit Champion cites admits there were "off-col-ored text messages and pictures texted back and forth," Martin did not state that they were "texted back and forth" with *Schultes.* Doc. No. 36–3 at 15–16.

employees who previously engaged in conversation with him no longer would do so. More specifically, he alleges that he was (a) excluded from a workplace social gathering, (b) treated unfairly in connection with his purchase of a vehicle and (c) ordered to clean an oil spill on one occasion even though that task did not fall within his job description.[4]

The social gathering was a going away party for another employee in April or May of 2012. Martin was told that neither of Champion's departments had food for him, as the sales department considered him to be part of the service department while the service department considered him to be part of the sales department. Martin states that he complained to at least three employees, including Tapps, to no avail. As such, he had to leave the party and go offsite to get food while all other employees were able to eat on the premises. Champion admits that the incident occurred but contends it was merely a mistake arising from the fact that Martin's job duties were split between the two departments.

The vehicle purchase incident occurred in February 2012, when Martin sought to purchase a vehicle being marketed by another dealer. Martin believed Champion had a policy in place forbidding employees from purchasing vehicles elsewhere, so he talked to Payer about the situation. He states that he asked Payer to acquire the vehicle from the other dealer so Martin could then purchase it from Champion. Champion has taken this action from time-to-time for other employees. The parties dispute what happened next. Martin states Payer told him it would cost Martin an extra $3,000 to have Champion acquire the vehicle and sell it to Martin. Martin further contends that Payer told him he could go work for the other dealer if he wanted to buy the vehicle directly from that dealer. Faced with these alleged options, Martin states that he decided to buy a different vehicle directly from Champion and ultimately had to spend an additional $4,000 to fix various problems with that vehicle.

Champion's version starts with a denial that it requires its employees to buy their vehicles from Champion. Champion acknowledges that Martin talked to Payer about a vehicle being sold by another dealer, but states that Martin eventually found a different vehicle on Champion's lot that he decided to purchase. Champion contends Martin never again talked to Payer about the other dealer's vehicle and that Payer never threatened Martin's job or refused to acquire the other vehicle for him.

The oil spill incident occurred in May 2012 when a customer complained that her vehicle was leaking oil in her garage after an oil change at Champion. It is undisputed that Martin did not perform the oil change. However, Martin was sent to the customer's home to retrieve the vehicle so the problem could be fixed. Tapps then talked with him about returning to the customer's home to clean the oil spill. Martin describes this as being "instructed" to clean up the spill, while Champion states he was simply "asked by Tapps" to make an effort to clean the oil as a custom-

---

4. Martin also claimed that he was discriminated against by not being given paid leave like other full-time employees. Doc. No. 26- at 8–9 (¶¶ 62–65). However, Champion then came forward with payroll documents showing that Martin received and used paid leave during the course of his employment. Doc. No. 36–3 at 6–12. During the hearing, Martin's attorney acknowledged that he had no basis for disputing Champion's records. As such, I will not give further consideration to Martin's contention that he was denied paid leave.

er service gesture. Either way, Martin had never before been asked to clean an oil spill. He notes that this task is not included in the written job description for his position. Champion states that the job description listed the tasks for which Martin was accountable but did not preclude the assignment of other duties as necessary. Martin was paid for his time while cleaning the spill.

*The Petzenhauser Text Message.* The record is somewhat muddled as to the nature of the relationship between Martin and Petzenhauser, the sales manager. While Martin denies that he ever sent text messages of a racial nature to any Champion employees, he admits that he exchanged "off-colored" text messages, including pictures and jokes, with some employees. Doc. No. 32 at 1. Confusingly, Martin both admits and denies that Petzenhauser was one of those employees. At one point, Martin cites to his own deposition testimony and claims that all text messages he exchanged with Petzenhauser were work-related. Doc. No. 26–2 at 9 (¶¶ 67–68). However, Martin also "admits that he exchanged pictures by text of scantily clad women with Mr. Petzenhauser." Doc. No. 32 at 3. He references "the bawdiness of the texts and the degree of nudity reflected in the text messages." *Id.*

For his part, Petzenhauser contends that he did receive "joke" type text messages from Martin, including at least two that were of a racial nature. He testified that Martin has a good sense of humor and regularly made light of his own status as Champion's only black employee.

Despite this murkiness, it is undisputed that on the morning of June 6, 2012, during work hours, Petzenhauser sent Martin a text message that included a photograph of three cans of "light" beer, wearing white hoods, and a dark beer bottle hung by a noose tied around the top of the bottle. Petzenhauser claims he sent the message (hereafter the "beer bottle message") to "lighten the mood," as he thought Martin was having a bad day. Petzenhauser sent the text despite knowing that Schultes had been disciplined for sending Martin the white Christmas message six months earlier.

After receiving the beer bottle message, Martin contends that he called his wife and told her he could no longer take the abuse. It is undisputed that Martin then left Champion's premises without informing any co-workers, managers or supervisors about the text message. Martin states that he attempted to report the message to either Payer or Tapps but that neither was present, meaning Petzenhauser himself was the only manager on site. Champion denies having knowledge of whether Martin attempted to locate Payer or Tapps. Either way, Martin never returned and admits that he quit his job on June 6, 2012. He contends he quit because of the beer bottle message.[5]

Once Petzenhauser realized Martin had left the premises, he went to Payer and told him about the text message. Petzenhauser received a written reprimand and was told he would be discharged if it happened again. Petzenhauser also sent another text message to Martin in which he stated that he had received "worse" messages from Martin. Martin did not respond to this message, or to any other communications from anyone at Champion.

## IV. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the

5. Champion suggests that Martin had been planning to quit prior to June 6, 2012, pointing to his use of vacation time prior to that date.

claims asserted in a case. Fed.R.Civ.P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A material fact is one that " 'might affect the outcome of the suit under the governing law.' " *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), or when " 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir.2005) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348, or evidence that is "merely colorable" or "not significantly probative," *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods,* 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.,* 383 F.3d 779, 784 (8th Cir.2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1376–77 (8th Cir.1996).

Given that each party has filed a motion for summary judgment, my perspective of the evidence will change depending upon which motion I am considering. In deciding whether Champion is entitled to summary judgment, I must consider the

evidence most favorably to Martin. Conversely, in deciding whether Martin is entitled to summary judgment, I must consider the evidence most favorably to Champion.

## V. ANALYSIS

As noted above, Martin asserts claims under federal and Iowa law that he was subjected to both (a) a hostile workplace environment and (b) race discrimination. Iowa courts apply the same analysis to claims brought under the Iowa Civil Rights Act (ICRA) that federal courts apply to claims brought under Title VII of the Civil Rights Act of 1964, as amended. *See Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir.2003) (considering hostile work environment claims under the ICRA and Title VII together); *Boyle v. Alum–Line, Inc.*, 710 N.W.2d 741, 748 (Iowa 2006) (analyzing an ICRA hostile work environment claim under the same framework applied in Title VII cases); *Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003) (Iowa courts traditionally look to Title VII when interpreting the ICRA). Martin agrees that his Iowa claims should be analyzed together with their federal counterparts. Doc. No. 26–1 at 6 n. 1.

### A. Hostile Work Environment

"Hostile work environment claims are limited in nature, requiring a high evidentiary showing that the plaintiff's workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir.2007); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Farmland Foods, Inc.*

*v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 744–45 (Iowa 2003). To make out a prima facie case of a hostile work environment, Martin must show (a) he belonged to a protected class; (b) he was subject to unwelcome harassment; (c) a causal connection between the harassment and his protected status; and (d) the harassment affected a term, condition, or privilege of employment. *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1194–95 (8th Cir.2006) (citing *Al–Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005)). If Martin is able to establish a *prima facie* case, the issue of whether the alleged harassers were supervisors or non-supervisors becomes important in assessing Champion's potential liability. If a harasser was not a supervisor, then a plaintiff must show that his or her employer knew or should have known of the harassment and failed to take proper action. *Id.* If a harasser was a supervisor *and* the harassment resulted in a tangible employment action, the employer is vicariously liable for the harassment. *Vance v. Ball State University*, —— U.S. ——, 133 S.Ct. 2434, 2442, 186 L.Ed.2d 565 (2013). If the harasser was a supervisor but the harassment did not result in a tangible employment action, the employer is vicariously liable for the harassment if it cannot satisfy the affirmative defense described in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). *Vance*, 133 S.Ct. at 2442; *Farmland Foods*, 672 N.W.2d at 744.

Here, there is no dispute that Martin, as an African–American, belongs to a protected group. Moreover, for purposes of considering Champion's motion I will assume that Martin was subject to unwelcome harassment that occurred because of his protected-group status. The first critical

inquiry, then, is whether that harassment affected a term, condition or privilege of Martin's employment. If it did, the next step would be to consider Champion's liability in light of the supervisory or non-supervisory status of the harassers.

### 1. Did the harassment affect a term, condition or privilege of Martin's employment?

In making this determination, courts consider all of the relevant circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir.2002); *Farmland Foods*, 672 N.W.2d at 744–45. Not all conduct that is deplorable and offensive rises to this level, as courts strive to avoid imposing "a code of workplace civility." *Id.* at 843. Thus, for example, the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not rise to an actionable level. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Instead, "[m]ore than a few isolated incidents are required," and the harassment must be so intimidating, offensive, or hostile that it "poisoned the work environment." *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir.1999) (citations omitted); *see also Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir.2003) (noting that "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

Under this standard, judgment as a matter of law in favor of employers has been affirmed in many cases involving alleged conduct that went way beyond the bounds that one should expect from grown adults. In *Woodland*, the Eighth Circuit Court of Appeals affirmed the grant of summary judgment in favor of the employer despite evidence of the following conduct over a four-to-five year period:

• On three occasions, a co-worker told Woodland that another employee had used a racial epithet in referring to him.

\*   \*   \*

• On two other occasions, Woodland as union steward heard about racial epithets directed at other African American employees. He advised those employees either to do nothing or to report the conduct to a supervisor. The one time an incident was reported, management told the offending employee that if he did not cease using such terms he would be fired.

• On another occasion, a co-worker made an obscene gesture when Woodland said he should get back to work. There was no apparent racial connotation to the gesture. A foreman reported the behavior to Renaud, who offered to fire the offensive employee. Again, Woodland asked Renaud not to fire him.

• Several years ago, copies of a "poem" with racist, sexist, and homophobic messages were strewn about the plant. Management immediately collected and disposed of the copies. In 1996, racist graffiti-drawings of "KKK," a swastika, and a hooded figure-appeared on the walls of one of the men's restrooms at the plant. Woodland brought the graffiti to the attention of management. He was furnished spray paint to cover the graffiti. Plant manager Thomas Eckert called a meeting and explained such graffiti would not be tolerated. The plant operations manager later posted flyers warning that anyone placing inap-

propriate literature on the walls would be disciplined severely. Woodland testified the misbehavior stopped.

302 F.3d at 844. While recognizing that the conduct at issue was offensive, the court concluded that "it was 'neither severe nor pervasive enough to create a hostile work environment.'" *Id.* at 844 (quoting *Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 579 (8th Cir.1999)).

Similarly, in *Duncan v. General Motors Corp.*, 300 F.3d 928 (8th Cir.2002), the court reversed the district court's denial of the defendant's motion for judgment as a matter of law after a jury awarded substantial damages to the plaintiff on a hostile work environment claim. *Id.* at 930–31. The evidence disclosed many incidents of boorish, obnoxious behavior directed at the plaintiff, Diana Duncan, over a period of more than two years. *Id.* at 931–32. Soon after Duncan's employment started, her supervisor (Booth) propositioned her. *Id.* at 931. Booth became hostile toward Duncan, and critical of her work, after she rejected his advance. *Id.*

During the remainder of Duncan's employment, Booth engaged in various forms of inappropriate conduct, including: (1) directing Duncan to use a computer that had a picture of a naked woman as its screen saver, (2) touching Duncan's hand unnecessarily on four or five occasions, (3) maintaining a planter in his office that was shaped like a man and had a hole in the front of the man's pants through which a cactus protruded, (4) responding to Duncan's request for a position as illustrator by telling her to draw his planter, (5) taking Duncan to a bar against her will after an off-site event and (6) directing Duncan to type a draft of the beliefs of the "He–Men Women Hater's Club." [6] *Id.* at 931–32.

Duncan resigned after refusing to type the requested draft. *Id.* at 932. In reversing the judgment in her favor, the Eighth Circuit found that the harassment she endured "was not so severe or pervasive as to alter a term, condition, or privilege of Duncan's employment." *Id.* at 934. The court stated:

> To clear the high threshold of actionable harm, Duncan has to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult." … "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment— an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." … Thus, the fourth part of a hostile environment claim includes both objective and subjective components: an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive.… In determining whether the conduct is sufficiently severe or pervasive, we look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work per-

---

**6.** The "beliefs" were as follows:
- Constitutional Amendment, the 19th, giving women [the] right to vote should be repealed. Real He–Men indulge in a lifestyle of cursing, using tools, handling guns, driving trucks, hunting and of course, drinking beer.
- Women really do have coodies [sic] and they can spread.
- Women [are] the cause of 99.9 per cent of stress in men.
- Sperm has a right to live.
- All great chiefs of the world are men.
- Prostitution should be legalized.

*Id.* at 931–32.

formance." ... However, Title VII is "not designed to purge the workplace of vulgarity." ... These standards are designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."

*Id.* [citations omitted]. The court concluded by stating that while "Booth's actions were boorish, chauvinistic, and decidedly immature ... we cannot say they created an objectively hostile work environment permeated with sexual harassment." *Id.* at 935.

By contrast, a district court's grant of summary judgment for the employer was reversed in *Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906 (8th Cir.2003). The court summarized the evidence of harassment as follows:

Our review of the record (which consists primarily of Mr. Reedy's deposition testimony) reveals five incidents that can plausibly be characterized as involving racial harassment. One incident involved a fellow Quebecor employee. Apparently, the employee agreed to bring back lunch for a group of Quebecor employees, including Mr. Reedy. When he failed to produce the lunch that Mr. Reedy had ordered, Mr. Reedy asked him whether he had bought it. The employee responded by throwing money at Mr. Reedy and saying, "Fucking nigger, go your own self the next time." The employee's father (also a Quebecor employee) laughed as he witnessed the incident. Mr. Reedy did not file a complaint or otherwise mention this incident to a supervising employee.

Mr. Reedy also witnessed two ugly occurrences of relevance. In one incident, two employees approached Rickey Huntley, a black man, called him a "punk ass nigger" and told him that they were going to "whip his punk ass." Mr. Reedy did not involve himself in the dispute, but was later called into the office of the plant manager, Kevin Morris, to confirm Mr. Huntley's account of the incident. As a result of the investigation, one of the offending employees received a one-week suspension and the other was terminated. On another occasion, Mr. Reedy witnessed an employee accusing Travis Moore, another black employee, of stealing his car radio. After exclaiming that "all you niggers steal," the employee threw a metal blade at Mr. Moore. The offender was terminated after an investigation.

Lastly, in his deposition Mr. Reedy describes incidents involving the exhibition of racial graffiti. According to that testimony, during September, 1998, the phrase "Tommy smoked crack, white crack" was written in a men's bathroom stall (one of two at the plant) and the word "coon" was written below Mr. Reedy's name. In addition, there appeared a drawing of an ape accompanied by the phrase "all niggers must die." Mr. Reedy reported the graffiti to Keith Bender, his immediate supervisor, and to Mr. Morris. Soon thereafter, the graffiti was painted over.

Mr. Reedy claims that the racial graffiti reappeared in October 1998. This time, he says, his name was written below the phrase "kill all niggers" on the bathroom handrail. Mr. Reedy again reported the offending bathroom graffiti, to which Mr. Morris allegedly responded, "I got it off once. What do you want me to do, tear the wall down?" This graffiti was not removed until after Mr. Reedy left the employment of Quebecor.

333 F.3d at 908–09. In finding that this evidence was sufficient, the court distinguished *Woodland* on three bases: (1) the frequency of harassing incidents was high-

er in *Reedy* than in *Woodland*, (2) the racist graffiti in *Woodland* was removed immediately and (3) the messages conveyed in the *Reedy* workplace were direct and specific threats against the plaintiff, not just "generically threatening" as in *Woodland*. *Id.* at 909–10.

Here, viewing the evidence most favorably to Martin, he experienced the following episodes of harassment:

1. On two to four occasions during his employment, he heard other employees use the term "nigger bar" to describe a tool.

2. Between March 2010 and December 23, 2011, he received up to four racially-themed text messages from Schultes, culminating with the white Christmas message.

3. He was excluded from one social gathering during work hours.

4. He was directed to clean an oil spill even though that task was not within his job description.

5. He was denied the opportunity to purchase a desired vehicle.

6. He received the beer bottle message from Petzenhauser on June 6, 2012, during work hours.

I find that these incidents fail, as a matter of law, to clear the "high threshold" necessary to establish an actionable case based on a hostile work environment. Three of these incidents (numbers 3, 4 and 5 on the above list) were one-time events that involved no direct or obvious connection to Martin's race. Martin's case would be far stronger if, for example, these events had occurred more frequently and had been accompanied by comments about his race.

As for incident 1, the use of a racial epithet to describe a tool is idiotic and deplorable, but Martin's own testimony is that he heard the phrase used no more than four times during his two years of employment. Doc. No. 26–3 at 75–76. These stray, isolated remarks do not lend substantial support to Martin's claim.

More troubling, of course, are the text messages. Again, however, the number of messages at issue (no more than five over two years) does not reflect pervasive harassment. Martin's best argument arises from the fact that some of the messages could be perceived as being somewhat threatening in nature. Those include: (a) the message from Schultes that depicted a black man running from the Klux Klan, (b) the white Christmas message (which included an image of burning crosses and Santa Clause wearing a Klan hood) and (c) the beer bottle message (which showed a dark beer bottle being hung by a noose). It would not be surprising if an African–American employee receiving these messages construed them as intimating and threatening. Here, however, Martin does not allege that he actually felt threatened by any message. *See, e.g.* Doc. No. 26–2 (Martin's statement of undisputed facts).

In *Reedy*, the court contrasted *Woodland* by stating: "[W]hat appeared in the Quebecor bathroom stalls can be described as nothing less than a death threat aimed directly and specifically at Mr. Reedy-a death threat, moreover, that stayed on the wall for five months. We think that this threat can fairly be characterized as severe." 333 F.3d at 909. This factor is not present here. If any of the text messages at issue was accompanied by a comment directed at Martin (for example, a message of "This is you tomorrow" in connection with the beer bottle message), Martin would have a stronger argument that it presented a severe, specific threat. However, that is not the case. At most, the messages included symbolism of a generically-threatening nature that Martin, him-

self, did not consider to be actually threatening.

Viewing the evidence most favorably to Martin, and considering all of the relevant circumstances (including the frequency of the conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with Martin's work performance), I find that Martin has failed as a matter of law to satisfy the fourth element of his hostile work environment claim. He has not shown that the conduct at issue, while deplorable, was sufficiently severe or pervasive to alter the conditions of his employment. As such, I must grant Champion's motion for summary judgment on Martin's hostile work environment claim and deny Martin's motion for partial summary judgment on that claim.

### 2. Would Champion be liable for the harassment?

Even if Martin could establish the fourth element of a hostile work environment claim, he would also have to show that Champion is liable for the harassment at issue. As noted above, the analysis depends on whether the harassers were supervisors or nonsupervisors. In *Vance*, the Supreme Court addressed the definition of "supervisor" for purposes of hostile work environment claims. The Court rejected broad interpretations of the concept and held that a "supervisor" is an employee "the employer has empowered ... to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsi-

bilities, or a decision causing a significant change in benefits.' " *Id.* at 2443 (quoting *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257).

■ Under this definition, the undisputed evidence shows that none of the harassers at issue in this case were supervisors. Only Payer, as Champion's owner, had the authority to hire, fire, change pay or significantly alter duties with regard to Martin. Doc. No. 26–3 at 151; Doc. No. 36–3 at 3. While Petzenhauser held the title of sales manager, he did not have the authority to take significant action with regard to Martin's employment. *Id.* Because Payer is not alleged to have been a harasser,[7] Champion could be liable for the harassment only if knew or should have known of the harassment and failed to take proper action. *Gordon*, 469 F.3d at 1194–95.

The record, even when viewed most favorably to Martin, does not support that finding. There is no evidence suggesting Champion should have known of any text messages Schultes sent to Martin before the white Christmas message. When Martin complained about that message, Schultes was immediately reprimanded, suspended and warned that termination would be the next step. Martin does not claim that Schultes engaged in any subsequent, inappropriate conduct.

As for beer bottle text message sent by Petzenhauser on June 6, 2012, Martin did not give Champion the opportunity to take remedial action. It is undisputed that he left work, never returned and did not respond to Champion's efforts to contact him. Petzenhauser himself reported the message to Champion and, as a result, received a reprimand and a warning that termination would be the next step.

---

**7.** Payer's only role in any of the events at issue is that he allegedly would not purchase a vehicle from another dealer and sell it to Martin. Even if that incident occurred in the manner Martin alleges, it was a single incident that does not even arguably constitute unwelcome harassment based on Martin's race.

As for the other incidents, there is no evidence that Champion had reason to know that Martin considered his race to be a factor in being excluded from a social gathering or being asked to clean an oil spill. Martin does not claim that he advised anyone at Champion of any belief that these actions were directed at him because of his race. Nor is there other evidence suggesting that Champion should have known that Martin was being treated adversely by other employees because of his race. *Cf. Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 519–20 (8th Cir. 2010) (no employer liability absent evidence that the employer should have known that the conduct of other employees was racially-motivated).

Even if Martin could show that the harassment he experienced at Champion was sufficiently severe or pervasive to alter the conditions of his employment, the record does not give rise to a genuine issue of material fact as to whether Champion would be liable for that harassment. This provides a second, alternative basis on which I must grant Champion's motion for summary judgment on Martin's hostile work environment claim and deny Martin's motion for partial summary judgment on that claim.

### B. Race Discrimination

■ To prevail on a claim of discrimination based on race, Martin must show that (1) he is a member of a protected class, (2) he was meeting Champion's expectations, (3) he suffered an adverse employment action and (4) he was treated differently than similarly situated employees were not members of his protected class. *Jackman v. Fifth Judicial Dist.*, 728 F.3d 800, 804 (8th Cir.2013); *Farmland Foods*, 672 N.W.2d at 741–42. The first two elements are undisputed. *See* Doc. No. 36–4 at 25. The remaining issues are (1) whether Mar-

tin suffered adverse employment action and, if so, (2) was he treated differently than similarly-situated employees.

■ An adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Jackman*, 728 F.3d at 804 (citing *Wilkie v. Dep't of Health and Human Servs.*, 638 F.3d 944, 955 (8th Cir.2011)). Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, are not adverse employment actions. *Id.*

Martin initially alleged two forms of adverse employment action: (1) denial of paid vacation benefits and (2) constructive discharge. As noted above, he has withdrawn his claim concerning vacation benefits in the face of Champion's production of payroll records contradicting that claim. *See* note 4, *supra.* Thus, to establish this element of his discrimination claim Martin must show that he was constructively discharged. The Eighth Circuit Court of Appeals has stated: "To prove a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir.2010); *see also Van Meter Indus. v. Mason City Human Rights Comm'n*, 675 N.W.2d 503, 511 (Iowa 2004). Moreover, "an employee must give [his or] her employer a reasonable opportunity to resolve a problem before quitting." *Sanders v. Lee Cnty. Sch. Dist. No. 1*, 669 F.3d 888, 893 (8th Cir.2012); *see also Van Meter*, 675 N.W.2d at 511.

The constructive discharge analysis is similar to, and ultimately more stringent than, the hostile work environment analysis:

> To prove a constructive discharge, the plaintiff must prove that her employer rendered the employee's working conditions intolerable, forcing the employee to quit. *See Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.,* 130 F.3d 349, 354 (8th Cir.1997); *Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d 568, 574 (8th Cir. 1997). "Behavior that can be characterized as 'merely offensive' is not actionable, but 'a tangible psychological injury' on the part of the employee is not required for the employer's behavior to be illegal." *Delph,* 130 F.3d at 354 (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367). If the plaintiff is to succeed on such a claim, the conduct complained of must have been "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Id.* (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367). Furthermore, the environment must be perceived subjectively by the victim as hostile, or the conduct cannot be said to have "actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* (quoting *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367) (citing *Kimzey,* 107 F.3d at 573). The Eighth Circuit has held that "the employer's actions leading to the decision to quit must have been deliberate, and taken with the intention of forcing the employee to quit." *Id.* (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981)). In the alternative, where conscious intent is absent, the intention element may nevertheless be satisfied by proof demonstrating the employee's "resignation was a reasonably foreseeable consequence" of the hostile atmosphere of the plaintiff's workplace. *Id.* (citing *Hukkanen v. Int'l Union of Operating Eng'rs, Local 101,* 3 F.3d 281, 285 (8th Cir.1993)).

*Lopez v. Aramark Uniform & Career Apparel, Inc.,* 426 F.Supp.2d 914, 941 (N.D.Iowa 2006) [footnote omitted]. Thus, Martin must prove not only that he suffered from a hostile or abusive work environment, but also that Champion either intended to force his resignation or, at least, should have reasonably expected that he would resign. He further has to prove that he gave Champion the opportunity to resolve the problem before quitting.

As a matter of law, Martin has failed to make any of these required showing. As discussed in Section V(A)(1), *supra,* the evidence does not show that the harassment Martin experienced at Champion was sufficiently severe or pervasive to create a hostile or abusive work environment. Nor does the evidence, when viewed most favorably to Martin, suggest that Champion intended to force his resignation or, at least, should have expected that he would resign. Finally, it is undisputed that Martin left his employment as a result of the beer bottle message without giving Champion the opportunity to address that incident.

Martin was not constructively discharged. Nor does the evidence support a finding that he suffered any other form of adverse employment action. As such, I must grant Champion's motion for summary judgment on Martin's race discrimination claim and deny Martin's motion for partial summary judgment on that claim.[8]

---

8. Because Martin did not suffer an adverse employment action, it is unnecessary to address the question of whether he was treated more-harshly than similarly-situated employees who are not members of the protected class.

## VI. CONCLUSION

For the reasons set forth herein:

1. The motion (Doc. No. 22) for summary judgment filed by defendant Champion Ford, Inc., is **granted** as to all counts of the amended complaint.

2. The motion (Doc. No. 26) for partial summary judgment filed by plaintiff Nathan A. Martin is **denied.**

3. Judgment shall enter in favor of defendant Champion Ford, Inc., and against plaintiff Nathan A. Martin.

4. The trial of this case, currently scheduled to begin October 1, 2014, is hereby **canceled.**

**IT IS SO ORDERED.**