# IN THE SUPREME COURT OF IOWA

No. 21–1898

Submitted November 16, 2023—Filed April 12, 2024

**TRACY WHITE,**

Appellee,

vs.

**STATE OF IOWA** and **IOWA DEPARTMENT OF HUMAN SERVICES,**

Appellants.

---

Appeal from the Iowa District Court for Polk County, Scott Rosenberg, Judge.

State employer appeals judgment on jury verdict awarding damages for a hostile-work-environment claim under the Iowa Civil Rights Act. **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Waterman, J., delivered the opinion of the court in which all justices joined.

Brenna Bird, Attorney General; Alexa Den Herder (argued) and Tessa M. Register (until withdrawal), Assistant Solicitors General; and Kayla Burkhiser Reynolds (until withdrawal), Assistant Attorney General, for appellants.

Paige Fiedler (argued) and Madison Fiedler-Carlson of Fiedler Law Firm, P.L.C., Johnston, for appellee.

**WATERMAN, Justice.**

The State of Iowa, as employer-defendant, appeals from an adverse judgment on an employee-supervisor's hostile-work-environment claim under the Iowa Civil Rights Act (ICRA). The plaintiff remained employed at the state agency after her complaints about her boss led to his termination. The State argues that we should decide "under what circumstances can evidence of harassment of *other* employees be used to prove that the *plaintiff's* work environment was impermissibly hostile?" The district court denied the employer's pretrial motion in limine to exclude so-called "me too" evidence[1] as unduly prejudicial, and the employer lodged a "standing" objection to certain exhibits. Considerable me-too testimony was admitted at trial without objection. The plaintiff's own job duties as a supervisor included receiving reports of alleged discrimination experienced by other employees, and she relied, in part, on such reports to support her own hostile-work-environment claim. The jury found that the plaintiff proved a hostile work environment and awarded her $260,000 for past emotional distress and $530,000 for future emotional distress. The State moved for a judgment notwithstanding the verdict (JNOV) or a new trial, arguing that the evidence was insufficient to prove the plaintiff's *own* hostile-work-environment claim, that the district court erred by admitting the me-too evidence and incorrectly instructing the jury on its usage, and that the future emotional distress damages were excessive. The district court denied the State's post-trial motions, and we retained the State's appeal.

On our review, we resolve the case on one dispositive issue. The parties agree that me-too evidence of which the plaintiff was unaware cannot prove that

---

[1]Me-too evidence has been described as "[e]vidence of multiple employees complaining about discrimination at a single workplace." *Garang v. Smithfield Farmland Corp.*, 439 F. Supp. 3d 1073, 1095 (N.D. Iowa 2020).

she personally experienced a hostile work environment. The discrimination experienced by others and reported to her was insufficient to prove her own hostile-work-environment claim. We conclude that the harassment the plaintiff personally experienced was not objectively severe or pervasive enough to alter the terms or conditions of her employment. On that ground, the district court erred by denying the State's motion for JNOV. We reverse the judgment for the plaintiff and remand for entry of an order granting the State's motion for JNOV.

## I. Background Facts and Proceedings.

Tracy White began working for the Iowa Department of Human Services (DHS)[2] in 2000 as a Social Work Case Manager. She received excellent performance evaluations. By 2010, White had been promoted to Social Work Administrator (SWA), managing the supervisors who directly manage social workers. She remained in that position over the next decade.

White initially reported to Patricia Penning. In 2015, Mike McInroy, another SWA, was promoted to Des Moines Service Area Manager (SAM), and White began reporting to him. McInroy's boss was Division Administrator Vern Armstrong. White and McInroy had a fraught relationship. She first complained to DHS management about McInroy in 2017, and after further complaints, he was terminated in early 2019. White has remained employed as an SWA at DHS.

**A. White Files Her Civil Rights Complaint and Lawsuit.** On February 18, 2019, White filed a complaint against DHS with the Iowa Civil Rights Commission alleging gender discrimination and harassment in violation

---

[2]"DHS . . . officially bec[a]me the Iowa Department of Health and Human Services (HHS) on July 1, 2023. The proceedings in this case took place while the entity was still DHS. Accordingly, we refer to it as 'DHS' throughout this opinion." *Vasquez v. Iowa Dep't of Hum. Servs.*, 990 N.W.2d 661, 664 n.1 (Iowa 2023).

of the ICRA. Six months later, the Commission issued her a right-to-sue letter, and White filed this civil action that November.

In her petition, White alleged multiple instances of inappropriate conduct by McInroy, some of which White witnessed and some of which she learned about later. White also alleged multiple instances of inappropriate conduct by other employees McInroy supervised at DHS. Before trial, White dismissed her direct claims of sex discrimination and retaliation. White's lone remaining claim—that she suffered a hostile work environment—was tried to the jury.

**B. Evidence Presented at Trial.**

1. *Incidents before 2015.* White testified about two instances of sexual misconduct by her coworkers before 2015—while Penning was her supervisor. One instance she observed herself; the other was reported to her as supervisor. In 2012, while at a bar with coworkers, White overheard a joke about McInroy being a "suck-up" to Armstrong. DHS Business Manager Pauline Rutherford joked: "What's purple and polka dotted and hangs between Vern Armstrong's legs? Mike's tie." White testified that neither she nor anyone else reported the joke to DHS leadership.

About a year later, White testified about two supervisors in a county office reporting to her that a female staff member routinely called the Community Liaison Darin Thompson "Daddy" in the office. White was informed that Thompson once asked the female staff member, upon returning from the bathroom, "Have you washed your hands young lady? Do you need a spanking?" White met with Thompson to discuss the incident; Thompson denied it ever happened. No discipline resulted from the incident.

2. *Incidents involving White personally after 2015.* White then testified about the work environment after 2015, when Penning retired and McInroy was promoted as White's supervisor. White described the work environment as toxic

because McInroy "behaved in lewd, inappropriate, and demeaning ways." She stated that McInroy managed a dysfunctional, hostile, chauvinistic, and scary work environment at DHS. White also testified that McInroy was congenial, friendly, and inclusive with male employees and only female employees who were compliant, agreeable, and unassertive. White alleged that McInroy was verbally abusive and berated her; he treated her with hostility and enjoyed the power he possessed over her. That is why, as White testified, McInroy gave her more work than another female SWA who referred to McInroy as her "work husband."

White testified about specific instances of inappropriate conduct while McInroy was her supervisor, including misconduct by McInroy himself. The first incident occurred in February 2016. McInroy and White interviewed two female employees for a promotion to a supervisor position. McInroy commented to White that the one applicant was "attractive" and had "really sexy shoes" and that White likely preferred this applicant because she is a "shoe person." He referred to the second applicant as "dowdy."

Later that year, in a supervisors meeting, Social Work Supervisor Trisha Gowan joined the meeting wearing a plaid shirt, vest, and boots. Someone in the meeting complimented Gowan on how she looked. McInroy then commented that Gowan "kind of looked like a sexy lumberjack."

The next incident occurred in January 2017. McInroy and White were having a meeting in McInroy's office with the door open. A female coworker entered the office and said to White, "Oh my God, I had a nightmare about you last night that you fired me." McInroy interjected, "Oh, was she wearing black leather and whipping you in your nightmare, too?"

In the summer of 2017, White attended a leadership meeting in which the team discussed a female social worker's work attire being unprofessional and that she would have to stop wearing a "tight, short, red dress" to work. McInroy

commented that he and another employee were walking behind the social worker, and McInroy said that he could not decide if he should pray she dropped her pencil or pray that she did not.

Later, in 2018, during a leadership meeting, Rutherford told a story about when she and Thompson were touring a new county office under construction and described how warm it was. Rutherford then started to sing "Get Low" by Lil Jon, including the lyrics, "To the window, to the wall. To the sweat drop down my balls."

3. *Incidents reported to White.* White testified that other DHS employees came to her as their supervisor to report inappropriate conduct committed by McInroy and others at DHS. The first incident came from a female Income Maintenance Supervisor in early 2017. The female employee had resigned from her position at DHS and submitted a written exit interview, which was reviewed by White. The female employee wrote that it was difficult to work with McInroy, as well as Rutherford and Thompson. She described Rutherford as inappropriate, unprofessional, and disrespectful. She said McInroy repeatedly told her she was "too emotional" and degraded her as a female supervisor.

The second incident involved Beth Avery, a former Social Work Supervisor, in 2017. Avery filed a complaint with the Iowa Civil Rights Commission against McInroy, claiming that he discriminated against her based on her gender and sexual orientation. White testified that a number of the issues brought up in Avery's complaint were true, such as McInroy's difficulty working with strong women, McInroy routinely commenting about Avery and her sexuality, McInroy mentioning that he did not want to picture Avery and her female partner together, and McInroy often referring to Avery and other female Child Protective Supervisors as "assholes."

The third incident came in October when White met with Social Worker Jen Jackson. Jackson discussed her frustration working under Darci Patterson, another SWA. Jackson had photos, emails, texts, and recordings of inappropriate conduct by Patterson. White, however, did not get any details of the incidents involving Patterson at the time. In fact, White testified that she did not learn the details until Jackson's testimony at trial. Jackson testified about how Patterson would "turn everything into a sexual conversation." Patterson routinely discussed female employees' breast sizes, grabbed Jackson's breasts on multiple occasions, and kept sex toys and penis-shaped candles in her office.

Then, in 2018, the fourth incident occurred when Rutherford and White were having a casual conversation. Rutherford told White about a conversation she had with Thompson years prior. Rutherford stated that while she was with Thompson on a work trip, Thompson "talked in detail about how people sweat while they are having sex and that sweat drips down their back and pools around their anus." Thompson called it "the nectar of the gods."

That same year, White learned about another incident involving a female Child Protective Worker, who had recently resigned from her position, receiving an email from an IT Technician at DHS saying, "I'm going to miss my eye candy." The female employee reported it to her supervisor, who relayed the complaint to White. White then reported it to Rutherford, who, a week later, investigated the incident. White testified that Rutherford "did coaching and counseling" with the IT Technician.

4. *White's reporting of incidents.* White testified about when she reported harassment to DHS leadership. In April 2017, White met with Armstrong, McInroy's supervisor, to discuss Avery's grievance filed against McInroy. White also brought up the comment that McInroy made to her in January about White wearing black leather and whipping McInroy in his nightmare. A couple of

months later, White emailed Armstrong, stating that she had more information of alleged harassment, including Jackson's report about Patterson.

White's report triggered an investigation by DHS. The investigation culminated that autumn with a finding that "the difficult environment in the Des Moines Service Area was the result of differing management and communication styles on the leadership team." Problems persisted, however, after changes in the leadership team.

White testified that she complained to DHS Director Jerry Foxhoven about the sexual harassment, but nothing was done. Finally, White took her complaints to the Governor in January 2019, writing a letter detailing what she experienced at DHS. Another investigation resulted in Foxhoven suspending McInroy with pay. Then, in early February, DHS terminated McInroy.

**C. The Jury Verdict and Post-Trial Motions.** After an eleven-day trial, the jury sided with White, finding that DHS had maintained a hostile work environment. The jury awarded White $790,000 in emotional distress damages—$260,000 for past emotional distress and $530,000 for future emotional distress.

The State filed a JNOV motion together with a motion for new trial or remittitur on the issue of damages. The State's JNOV motion argued that White failed to prove she personally experienced a hostile work environment. The State's motion for new trial contended that evidentiary and instructional error on the me-too evidence warranted a new trial and that the future damage award was excessive. The State did not argue that the award for past emotional distress was excessive. The district court denied both motions, finding that White proved each element of her hostile-work-environment claim with substantial evidence and that the damages were not excessive, considering the evidence admitted at trial.

The State appealed, raising four issues: (1) the district court erred in allowing highly inflammatory, irrelevant, and prejudicial me-too evidence at trial; (2) the district court erred in instructing the jury that it could consider me-too evidence when weighing White's harassment claim; (3) the district court erred in denying the State's JNOV motion as "White failed to prove sufficiently severe and pervasive conduct"; and (4) the district court erred in not granting a new trial or remittitur on the excessive future emotional distress award. We retained the case.

## II. Standard of Review.

"We review a district court's ruling on a motion for judgment notwithstanding the verdict for errors at law." *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 18 (Iowa 2014). We must decide "whether there was sufficient evidence to justify submitting the case to the jury when viewing the evidence in the light most favorable to the nonmoving party," *id.* (quoting *Van Sickle Constr. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010)), which means substantial evidence to support "each element of the plaintiff's claim," *id.* "[E]vidence is substantial if 'reasonable minds would accept the evidence as adequate to reach the same findings.'" *Id.* (quoting *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 790 (Iowa 2009)).

## III. Analysis.

The State argues that the district court erred in denying its motion for JNOV on grounds that White failed to prove she personally experienced harassment that was objectively severe or pervasive as required to establish her own hostile-work-environment claim. White argues that the evidence on this issue was sufficient to generate a jury question. We agree with the State on this ground and therefore do not reach the remaining issues raised in its appeal.

When reviewing a ruling on a motion for JNOV, "we simply ask whether a fact question was generated." *Royal Indem. Co. v. Factory Mut. Ins.*, 786 N.W.2d 839, 846 (Iowa 2010). "We . . . view the evidence in the light most favorable to the party against whom the motion is intended, the nonmoving party." *Id.* "Each element of the plaintiff's claim must be supported by substantial evidence . . . ." *Van Sickle Constr.*, 783 N.W.2d at 687. "Evidence is substantial if a reasonable mind would find it adequate to support a finding," and "[w]e must take into consideration all reasonable inferences that could fairly be made by the jury." *Id.*

To establish a hostile-work-environment claim under the ICRA, the plaintiff must prove four elements: "(1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment." *Farmland Foods, Inc. v. Dubuque Hum. Rts. Comm'n*, 672 N.W.2d 733, 744 (Iowa 2003). "Harassment rises to the level of a hostile work environment '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult' . . . 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Valdez v. W. Des Moines Cmty. Schs.*, 992 N.W.2d 613, 631–32 (Iowa 2023) (alteration and omission in original) (quoting *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 571 (Iowa 2017)).

Federal caselaw provides guidance "[b]ecause the ICRA hostile-work-environment claim is modeled after its Title VII counterpart." *Haskenhoff*, 897 N.W.2d at 571 & n.2; *see also Simon Seeding & Sod, Inc. v. Dubuque Hum. Rts. Comm'n*, 895 N.W.2d 446, 458 (Iowa 2017) (stating that while federal law does not control ICRA claims, "it can provide 'the analytical

framework' " (quoting *Cochran v. Seniors Only Fin., Inc.*, 209 F. Supp. 2d 963, 966 (S.D. Iowa 2002))).[3]

"To establish whether harassment was severe or pervasive, the plaintiff must not only show he or she subjectively perceived the conduct as abusive, but that a reasonable person would also find the conduct to be abusive or hostile." *Farmland Foods*, 672 N.W.2d at 744. When determining whether the harassment was objectively severe or pervasive, we look to the totality of the circumstances and consider the "frequency" and "severity of the conduct," "whether the conduct was physically threatening or humiliating or whether it was merely offensive," and "whether the conduct unreasonably interfered with the employee's job performance." *Id.* at 744–45. "These factors . . . must disclose that the conduct was severe enough to amount to an alteration of the terms or conditions of employment" because "hostile-work-environment claims by their nature involve ongoing and repeated conduct, not isolated events." *Id.*; *see also Boge v. Deere & Co.*, No. 22–CV–2074–CJW–KEM, 2024 WL 690234, at *21–22 (N.D. Iowa Feb. 20, 2024) (granting employer's motion for summary judgment dismissing ICRA hostile-work-environment claim where evidence was insufficient to show harassment was severe or pervasive under *Farmland Foods*).

The parties agree that me-too evidence of which White was unaware cannot be used to prove her harassment was severe or pervasive. The first sentence of Jury Instruction No. 16 provided:

> In determining whether discriminatory or harassing conduct was sufficiently severe or pervasive enough to create a hostile environment, you may consider sexually harassing conduct that was directed toward others in the workplace, so long as Plaintiff Tracy White was aware of that conduct.

---

[3]At times we have found federal precedent unpersuasive when we interpret the ICRA. *See, e.g.*, *Vrough v. Iowa Dep't of Corr.*, 972 N.W.2d 686, 702 (Iowa 2022) (declining to follow *Bostock v. Clayton County*, 590 U.S. 644 (2020)).

Neither party objected to this part of the instruction, which is the law of the case for purposes of our review of the record for the sufficiency of the evidence.[4] *See State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009) (concluding that because the party "did not object to the instructions given to the jury at trial . . . the jury instructions bec[a]me the law of the case for purposes of our review of the record for sufficiency of the evidence").

The law is well settled that me-too evidence about which the plaintiff is unaware cannot be used to prove she experienced severe or pervasive harassment. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 210–11 (4th Cir. 2019) ("Our Court's precedent indicates that experiences of third parties about which a plaintiff was unaware should not be considered in evaluating a hostile work environment's severe or pervasive requirement. . . . Other circuit courts that have considered this issue have reached that same result."); *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014) ("The totality of a plaintiff's workplace circumstances does not include other employees' experiences of which the plaintiff is unaware [but only considers] the perspective of a reasonable person in the plaintiff's position, knowing what the plaintiff knew . . . not one who knows what the plaintiff learned only after her employment ended or what discovery later revealed." (citation omitted)); *Cottrill v. MFA, Inc.*, 443 F.3d 629, 636 (8th Cir. 2006) ("A Title VII plaintiff 'may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment.' " (quoting *Hirase-Doi v. U.S. W. Commc'ns, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), *and Faragher v. City of Boca Raton*, 524 U.S. 775 (1998))); *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d

---

[4]The State objected to the last sentence of Instruction No. 16 allowing consideration of such harassment for other issues. We do not reach the State's challenge to that language.

1036, 1046 (7th Cir. 2000) ("Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)."). For those reasons, we give no weight to the considerable me-too evidence that White first heard at trial.[5]

We must determine whether the evidence of harassment White herself experienced was sufficient to prove it was objectively severe or pervasive. This standard is "demanding" and "does not prohibit all verbal or physical harassment." *Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 806 (8th Cir. 2013) (quoting *Wilkie v. Dep't of Health & Hum. Servs.*, 638 F.3d 944, 953 (8th Cir. 2011)). "The standards governing a hostile work environment are intended to 'filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." ' " *State v. Watkins*, 914 N.W.2d 827, 843–44 (Iowa 2018) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). We reiterate that under the ICRA, the harassment must permeate the workplace so much that we can say it altered the terms and conditions of the plaintiff's employment and created an abusive working environment. *See Valdez*, 992 N.W.2d at 631–32.

In our view, White failed to establish she experienced " 'sufficiently severe or pervasive' conduct." *Lopez v. Whirlpool Corp.*, 989 F.3d 656, 663 (8th Cir. 2021) (quoting *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 538 (8th Cir. 2020)). White never testified she was physically threatened by McInroy or

---

[5]Examples of me-too evidence White first heard at trial include Jen Jackson's graphic trial testimony about the specifics of how supervisor Darci Patterson harassed her and displayed photos of sex toys and penis-shaped candles in her office. White also first heard at trial supervisor Chris Skuster's testimony recounting sexual jokes by Darin Thompson overheard by McInroy, his 2018 email to DHS Director Foxhoven complaining about Thompson's sexual banter, and his testimony that McInroy sent the wrong message to staff by promoting Thompson.

anyone else at DHS.[6] No one at DHS touched her inappropriately, propositioned her for sex, or pressured her for romance.[7] She was not assigned more work or paid less than a *male* social work administrator. Rather, she had generalized complaints that McInroy was rude to her, gave her extra work, and favored a *female* coworker; specific complaints about a handful of inappropriate things said between 2015 and early 2019 (mostly about other people); and complaints that management failed to take prompt remedial measures. Unlike many plaintiffs who allege that harassment forced them to quit and argue constructive discharge,[8] White remained on the job, a job she still enjoys after McInroy was terminated. White was never demoted or transferred, either.

This case is unlike *Haskenhoff v. Homeland Energy Solutions*, where the plaintiff quit after being repeatedly targeted and harassed by her supervisor:

> Haskenhoff was repeatedly harassed by her immediate supervisor, Kevin Howes, HES's operations manager. Howes repeatedly made inappropriate comments in Haskenhoff's presence. For example, Howes talked about Haskenhoff's breasts on at least three occasions, referring to them as "them puppies" or "the twins." Howes discussed Haskenhoff's body and attire with other employees and speculated out loud about what it would be like to have sex with her. He insinuated to other male employees that they could get Tina into bed. He commented on the attractiveness or unattractiveness of female job applicants and employees. He spoke at work about strippers. On multiple occasions, he used objects or engaged in body motions in front of Haskenhoff to simulate sexual behavior.

---

[6]*See Farmland Foods*, 672 N.W.2d at 744–45 (discussing one of the objective factors as "whether the conduct was physically threatening or humiliating or whether it was merely offensive").

[7]*See Lynch v. City of Des Moines*, 454 N.W.2d 827, 830, 835 (Iowa 1990) (holding that evidence the plaintiff was subjected to "repeated incidents of sexually derogatory remarks, vulgar insults, and requests for sexual favors" was sufficient to prove severe or pervasive harassment).

[8]*See Haskenhoff*, 897 N.W.2d at 591 ("Constructive discharge exists when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." (quoting *Van Meter Indus. v. Mason City Hum. Rts. Comm'n*, 675 N.W.2d 503, 511 (Iowa 2004))).

Haskenhoff's coemployees also engaged in inappropriate conduct in her presence. One displayed a screen saver on his computer of two young girls touching tongues. Another photographed Haskenhoff's cleavage at a company outing and showed that photo to others. Haskenhoff received an unwanted pornographic video from yet another employee. The atmosphere Haskenhoff experienced at the HES plant was unseemly and unprofessional.

897 N.W.2d at 562.

By contrast, only one of McInroy's offensive comments was directed at White. In January 2017, a female coworker told White she had a nightmare about her, and McInroy interjected, "Oh, was [White] wearing black leather and whipping you in your nightmare, too?"[9] No one else at DHS directed a sexist or demeaning comment to White about White. A supervisor's repeated slurs directed at the plaintiff can add up to a hostile work environment. *See Simon Seeding*, 895 N.W.2d at 470 (determining evidence was sufficient for the severe or pervasive element when the supervisor called the Black plaintiff racial epithets "two to three times a week over the two-month period" he worked there because "repeated harassing remarks may be sufficient to establish hostile working environment"). But one bad joke or harassing comment the boss utters to the plaintiff is not enough. *See id.* ("The ' "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not affect the

---

[9]White cites *O'Shea v. Yellow Technology Services, Inc.* for the proposition that a jury could find such a dream was based on gender. 185 F.3d 1093, 1099 (10th Cir. 1999) (reversing summary judgment for employer). White's brief failed to mention considerable additional evidence in that case—not found in our record—including "numerous instances of harassing conduct"; that the harasser told others the plaintiff "was incompetent and unable to do her job, that she was overemotional and hysterical, and that women in general were incompetent, stupid, and scatterbrained"; that the harasser "repeatedly told his coworkers that Plaintiff was going to file a sexual harassment lawsuit against him, which, according to Plaintiff, caused her coworkers to cut off contact with her and treat her poorly"; and that two other male coworkers "made derogatory comments about women jokingly all the time." *Id.* at 1098–99 (citations omitted). The *O'Shea* court goes on for several pages to describe, in detail, evidence of ways in which less experienced male coworkers were favored while the plaintiff's work was impeded. *Id.* at 1099–101.

terms, conditions or privileges of employment to a significant degree.' " (quoting *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 633 (Iowa 1990) (en banc))).

The remaining offensive comments that McInroy said in White's presence were about other women—multiple comments about Avery's sexual orientation, including not wanting to see her with her female partner; an interviewee's "sexy shoes"; a social worker looking like a "sexy lumberjack"; a woman in a tight, short red dress that he wondered aloud whether to pray she dropped a pencil or that she didn't. White also overheard Rutherford quote crude song lyrics about male anatomy. "[O]verhearing offensive comments is less severe or humiliating than being the intended target of direct harassment." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1336 (11th Cir. 2023) (per curiam) (affirming summary judgment dismissing hostile-work-environment claim when plaintiff overheard comments from coworkers using racial epithets to describe Black patients and calling President Obama and his wife demeaning terms). While the comments may have been offensive and unprofessional, none were "physically threatening" to White. *Farmland Foods*, 672 N.W.2d at 744–45 (considering "whether the conduct was physically threatening or humiliating or whether it was merely offensive"). These comments collectively were insufficient to show White suffered objectively severe or pervasive harassment. *See Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823–24, 826 (6th Cir. 1997) (holding that six occurrences of sexual vulgarity in the workplace, including in meetings, that took place over four months was not sufficiently severe or pervasive because most of the comments were not directed at plaintiff).

The comments White heard firsthand took place over three to four years—with roughly six-month gaps between comments. This is not "ongoing and repeated conduct," *Farmland Foods*, 672 N.W.2d at 745, and it does "not constitute a 'steady barrage of opprobrious [sexual] comment' sufficient to

support [an ICRA] hostile work claim," *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981)). *See also Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d. Cir. 2023) (finding that the "seven comments [the plaintiff] identified were spread out over a span of over three-and-a-half years," and the "relative infrequency" of the "remarks—reflecting one or two statements in a given six-month period—indicate[d] that his actions were not severe or pervasive harassment"). "[L]arge temporal gaps between allegations undermine a hostile-work-environment claim" and "suggest occasional problems, not pervasive ones." *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 408 (4th Cir. 2022).

Then, we have inappropriate comments White heard secondhand in casual conversation or reported to her as a supervisor. These were not incidents she personally overheard or witnessed contemporaneously while working on a common job floor. Secondhand reports are of relatively little value in showing that White personally experienced severe or pervasive harassment, particularly those that she learned about through her official duties as a supervisor. *See Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 603 (7th Cir. 2021) ("Indeed, we have repeatedly rejected hostile work environment claims that rest primarily on secondhand harassment."); *see also Strickland v. City of Detroit*, 995 F.3d 495, 516 (6th Cir. 2021) (Gibbons, J., concurring) ("[I]t is difficult to sustain a claim where the *majority* of the complained of conduct was directed at other individuals or was general, meaning that it was not directed at anyone in particular. . . . [I]t is important to separate the alleged facts that are directly relevant to Strickland's experience in his workplace from the facts that he did not himself experience and that did not occur in his presence or even in his precinct." (citation omitted)).

The State argues that inappropriate comments reported to a plaintiff, in the plaintiff's capacity as a supervisor, complaining about the harassment of others cannot support the plaintiff's own hostile-work-environment claim as a matter of law. Otherwise, a supervisor could fold into their own case the harassment experienced by others and thereby attain a preferred position under the ICRA. In effect, the State asks us to not recognize a vicarious hostile work environment theory where a plaintiff can recover for harassment experienced by others outside the plaintiff's presence. White responds that such reports are relevant to proving an overall hostile work environment. White also argues that her own emotional distress increased when she reported the complaints of others as well as her own without obtaining remedial measures. But White cites no on-point authority holding that harassment reported to a supervisor can establish the supervisor's own hostile-work-environment claim.

Assuming without deciding whether such reports can be considered, the evidence in this record remains insufficient to prove White herself suffered severe or pervasive harassment. For perhaps the crudest example, in 2018, in casual conversation, Rutherford told White that years earlier, Thompson—while on a work trip with Rutherford—talked about the "nectar of the Gods," referring to sweat dripping down to the anus during sex. Rutherford testified at trial that she personally did not find the comment offensive nor was she reporting the comment to White as a complaint. "The American workplace would be a seething cauldron if workers could with impunity pepper their employer and eventually the EEOC and the courts with complaints of being offended by remarks and behaviors unrelated to the complainant except for . . . having overheard, or heard of, them." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 556 (7th Cir. 2007); *see Yelling*, 82 F.4th at 1337 ("[I]t is a 'bedrock principle' that not all subjectively offensive language in the workplace violates Title VII." (quoting *Reeves v. C.H.*

*Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc))). We reiterate that "[d]iscriminatory comments that are 'merely part of casual conversation, are accidental[,] or are sporadic do not trigger . . . sanctions.' " *Vaughn*, 459 N.W.2d at 633 (omission in original) (quoting *Johnson*, 646 F.2d at 1257); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998) ("Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina*[*tion*] . . . because of . . . sex.' " (alteration and omissions in original) (quoting 42 U.S.C. § 2000e-2(a)(1))).

Nor does adding in the other reports to White get her over the high bar to prove her own hostile-work-environment claim. In 2017, White reviewed the exit interview of a coworker complaining that Rutherford was "inappropriate, unprofessional, and disrespectful" and that McInroy repeatedly said she was "too emotional" and degraded her as a female supervisor. In 2018, a male IT employee emailed a child protective worker, calling her "eye candy." White received her complaint and passed it on, and the IT employee was admonished without further incident. White also received and passed on complaints from Avery about McInroy and from Jen Jackson about Patterson. We credit White's testimony that she was frustrated by the lack of remedial action at DHS. But the harassment experienced by those coworkers and reported to her was not harassment White personally experienced. "[T]his fact contributes to our conclusion that the conduct here was not severe enough to create an objectively hostile environment." *Black*, 104 F.3d at 826 (reversing judgment on a jury verdict for insufficient evidence of a severe or pervasive hostile work environment when most of the comments were not directed at plaintiff); *see also Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1003–04 (5th Cir. 2022) ("[W]e have routinely held that similarly sporadic and abrasive conduct is neither severe nor

pervasive. And the fact that other women at the [workplace] may have experienced severe or pervasive treatment does not save [plaintiff's] claim." (footnote omitted)); *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) ("While certainly relevant to the determination of a hostile work environment claim, when harassment is 'directed at someone other than the plaintiff, the "impact of [such] 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." ' " (alteration in original) (quoting *McPhaul v. Bd. of Comm'rs*, 226 F.3d 558, 567 (7th Cir. 2000), *overruled in part by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013))).

White, citing a law review article and a Minnesota Supreme Court opinion,[10] argues what is objectively "severe or pervasive" to juries has changed since the #MeToo and #timesup movements. White observes that "[w]hat we expected women to put up with in the *Mad Men* era was vastly different from where we drew the line in the 1990s and from where we draw the line today" and that "[s]ocietal standards of decency governing workplace conduct have undeniably risen over the last ten to 30 years." Federal courts, however, have declined to hold that the #MeToo movement alters the scope of Title VII. *See, e.g.*, *Hardwick v. Ind. Bell Tel. Co.*, No. 1:15–cv–01161–JMS–DML, 2018 WL 4620252, at *15 (S.D. Ind. Sept. 26, 2018) (stating that "no court in the country, let alone in this Circuit, has suggested that the #MeToo Movement alters the scope of Title VII"); *see also Strickland v. Dart*, No. 19–cv–02621, 2023 WL 2745725, at *17 (N.D. Ill. Mar. 31, 2023) (rejecting argument that the #MeToo movement should

---

[10] *See* Joan C. Williams et al., *What's Reasonable Now? Sexual Harassment Law After the Norm Cascade*, 2019 Mich. St. L. Rev. 139, 154 ("Reasonableness standards are meant to build flexibility and continuous updating into the law, not to entrench norms from another time."); *see also Kenneh v. Homeward Bound, Inc.*, 944 N.W.2d 222 (Minn. 2020) ("Today, reasonable people would likely not tolerate the type of workplace behavior that courts previously brushed aside . . . .").

relegate precedent to the "dustbin of history" and granting summary judgment for employer on hostile-work-environment claim); *McKinley v. United Parcel Serv. Inc.*, No. 1:19–cv–02548–TWP–DLP, 2021 WL 4477830, at *12–14 (S.D. Ind. Sept. 30, 2021) (granting summary judgment for employer and rejecting plaintiff's argument relying on the #MeToo movement in hostile-work-environment claim).

White quotes *Kenneh v. Homeward Bound, Inc.*, where the Minnesota Supreme Court stated, "Today, reasonable people would likely not tolerate the type of workplace behavior that courts previously brushed aside . . . ." 944 N.W.2d 222, 231 (Minn. 2020). The *Kenneh* court made that statement to "clarify" its approach to interpreting the Minnesota Human Rights Act while expressly declining an invitation by the plaintiff and amici to "renounce the federal severe-or-pervasive standard for sexual harassment claims." *Id.* at 229–30. The egregious behavior at issue in *Kenneh* differs dramatically from what White experienced at DHS.[11]

Our own analysis today rests in part on federal cases decided as recently as this year, well after the #MeToo movement began in 2006 and accelerated in 2017. In an attorney discipline case, we recently rejected as implausible the respondent's effort to "excuse[] his behavior by noting that his conduct occurred before the #MeToo movement" brought sexual harassment "to the forefront of the

---

[11]Assata Kenneh's male harasser entered her office on their second encounter and "began talking to her in a seductive tone and licked his lips in a suggestive manner." *Kenneh*, 944 N.W.2d at 227. He gave a "proposition for oral sex" to her when he said, "I will eat you—I eat women." *Id.* at 227, 233. He once followed her to a gas station to talk to her and left without buying gas. *Id.* at 227. The harasser routinely stopped by her office, blocked her doorway, and "gesture[d] with his tongue, simulating oral sex." *Id.* He continually called her "sexy," "pretty," and "beautiful" each time he saw her, despite her requests for him to stop and despite warnings from the HR director. *Id.* The *Kenneh* court held this evidence raised a jury question on severe or pervasive harassment. *Id.* at 233–34 (reversing district court's summary judgment for the employer).

American consciousness." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Watkins*, 944 N.W.2d 881, 891 (Iowa 2020).[12] We noted consciousness of sexual harassment long predated the #MeToo movement. *Id.* at 891–92. We decline to hold that the #MeToo or #timesup movements undermine twenty-first-century precedent on the proof required to show objectively severe or pervasive harassment.

Finally, White relies on her testimony that McInroy was unkind, dismissive, difficult to work with, and unfair in allocating a larger workload to her compared to her female coworker—who referred to McInroy as her "work husband." White testified that McInroy favored women who were compliant compared to women, like White, who pushed back vocally. But as we have stated in the context of race, "antipathy between a supervisor and a black employee, absent evidence of racial discrimination, is not enough to establish a hostile work environment." *Farmland Foods*, 672 N.W.2d at 745. We reach the same conclusion here: White's poor relationship with McInroy and his practice of favoring another woman is insufficient to prove White was subjected to severe or pervasive harassment because of her gender. Merely having a bad boss does not get an ICRA hostile-work-environment claim to the jury. Nor does a personality conflict with a supervisor or being excluded from a social clique. *See generally Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 660 (7th Cir. 2005) ("Courts have resisted the idea that [Title VII] regulates matters of attitude or other small affairs of daily life—not just because of the maxim *de minimis non curat lex* (the law does not bother with trifles), but because almost every worker feels offended or aggrieved by many things that happen in the workplace, and sorting out which

---

[12]"Our definition of 'sexual harassment' in attorney disciplinary cases is broader than the employment standard under Title VII." *Watkins*, 944 N.W.2d at 891. We did not analyze whether Watkins' behavior was sufficient to establish a Title VII claim. *Id.*

of these occurred because of race, sex, religion, national origin, or a complaint about any of these would be an impossible task." (citation omitted)).

Indeed, White and Avery have both testified that McInroy displayed routine animosity toward them and had an "in crowd" and an "out crowd." That testimony, along with McInroy's repeated comments disparaging Avery's sexual orientation, was insufficient to avoid summary judgment dismissing Avery's ICRA claims against McInroy and DHS. *See Avery v. Iowa Dep't of Hum. Servs.*, 995 N.W.2d 308, 313–15 (Iowa Ct. App. 2023). As the court of appeals concluded in affirming summary judgment, "Taking the record in a light most favorable to Avery, it is clear that McInroy did harbor feelings that were not favorable to her, and made statements accordingly. Not all of these feelings or statements were tied to her status within a protected class, however . . . ." *Id.* at 314. We reach the same conclusion reviewing White's trial record.

The ICRA is not a "general civility code" for the workplace. *Valdez*, 992 N.W.2d at 632 (quoting *Haskenhoff*, 897 N.W.2d at 588). In our view, the evidence was insufficient to prove White experienced objectively severe or pervasive harassment that turned her own work environment into "a discriminatorily abusive or hostile workplace." *Simon Seeding*, 895 N.W.2d at 468 (quoting *Farmland Foods*, 672 N.W.2d at 743). "No rational jury, following the law, could conclude otherwise." *Nitkin*, 67 F.4th at 573. To affirm this judgment would undermine well-established precedent setting a high bar for proof of objectively severe or pervasive harassment, and it would expose Iowa employers to costly liability for sporadic vulgarities and common personality conflicts. We hold that the State was entitled to a JNOV dismissing her hostile-work-environment claim.

**IV. Disposition.**

For these reasons, we reverse the judgment for the plaintiff of the district court and remand the case for entry of an order granting the State's motion for JNOV.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**